UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

_____

|  |  |  |
|---|---|---|
| TRUSTPILOT DAMAGES LLC and TUMBACO INC. d/b/a QUASAR EXPEDITIONS, individually and on behalf of all others similarly situated, | ) ) ) ) | No. 1:21-cv-432-JSR |
| Plaintiffs, | ) ) | **AMENDED** **CLASS ACTION COMPLAINT** |
| v. | ) ) |  |
| TRUSTPILOT INC., | ) ) | Jury Trial Demanded |
| Defendant. | ) ) | **FILED VIA ECF** |

_____

All facts herein are alleged upon knowledge or information and belief.  Plaintiffs, by and through their attorneys, complaining of Defendant, sets forth and allege as follows:

## NATURE OF THE ACTION

1.      Trustpilot[1] operates "Trustpilot.com," a website founded in Denmark in 2007 that posts consumer reviews of businesses (the "Website").  The Website attracts substantial traffic, and is currently the 312th most popular site globally.

2.      The Website is set up so any user can review any business, free of charge.  A user-policed flagging system purportedly ensures that inauthentic reviews are quickly identified and scrutinized, and Trustpilot claims it also actively looks for these.

3.      Trustpilot sells subscriptions to businesses (the "Subscriptions").  These pricy annual Subscriptions provide its business customers access to consumer data and other purported benefits that Trustpilot claims provide (1) consumer-insight data generated by the Website's

_____

[1]  References herein to "Trustpilot" are collectively to Defendant Trustpilot Inc. and Non-Party Trustpilot A/S, in its own right and as predecessor-in-interest to Non-Party Trustpilot Group plc.

activity, and (2) limited means of controlling how consumer reviews about them are displayed online.

4.     Trustpilot's annual Subscriptions have imposed a "negative option," whereby customers were automatically re-enrolled for another year unless the customer gave notice of an intent to cancel.   In order to prevent its customers from cancelling, Trustpilot prevents its customers from actually receiving notice of their impending renewal dates.   Trustpilot designed its notice-of-renewal emails so that the email would go straight to customers' junk folders, preventing them from being seen until subscribers were already auto-enrolled for the new year. Once re-enrolled, the customer could not cancel until the following year.

5.     Trustpilot designed its system to force auto-renewals, because promised business benefits failed to materialize and numerous Trustpilot customers viewed their Subscriptions as useless within a year of enrolling.   Investigations by *BBC News* and *The Times of London* in late 2018 and early 2019 showed that most Trustpilot customers gained little value from the service.

6.     A handful of comparatively wealthy subscribers benefited, however.   These subscribers were able to control their review-display, a feature not given to the majority of subscribers that were primarily small businesses.   Negative reviews about the select subscribers were either removed from the Website or buried from visibility in search and social media.   Clearly fake positive reviews that inflated prized subscribers' Trustpilot "score" remained on the Website, unflagged.

7.     Subscribers not benefiting from Trustpilot's special treatment soon found they were paying thousands of dollars a year in order to be exposed to often-fake negative reviews. Trustpilot's value to customers dropped even further after Trustpilot's integrity scandals caused Google to block Trustpilot ratings from appearing as embedded images in most search results for

businesses reviewed by Trustpilot, beginning mid-2019.  This diminished the value of Trustpilot's service even further.  Google stated this change was part of its ongoing fight to remove "self-serving reviews" from contaminating search results.  Trustpilot subscribers with clean hands were upset that possibly the greatest benefit of a Subscription—positive visibility in Google search results—had suddenly evaporated after it became clear Trustpilot colluded with preferred customers.

8.      In 2018, 2019, and 2020, Trustpilot faced a wave of cancellations from dissatisfied customers.  As a result, Trustpilot resolved to hold hostage unwitting subscribers for the additional year by exploiting a protective feature common to every email program or service—Outlook, Gmail, etc. (the "Email Clients")—that individuals and businesses, like the Class here, use for day-to-day correspondence (the "Email Users").

9.      Email Clients screen as junk any messages originating from an unrecognized domain name.  Such junk messages do not appear in Email Users' inboxes and are seldom viewed by users at all.  This screening feature prevents criminals from using a domain slightly similar to a well-known company's domain, to engage in "phishing"—fraudulently attempting to obtain a recipient's sensitive information by disguising the email such that it appears from a trusted sender.[2]

10.     Every company that emails a customer, let alone one in tech, knows well this feature of the Email Clients.  Indeed, there is a thriving subindustry of consultants who advise

---

[2]  For example only, anyone who uses Wells Fargo for banking will see in their inbox messages from any sender whose address ends in "@wellsfargo.com."   This is because the "@wellsfargo.com" domain is recognized as the one the bank uses to house its consumer-facing website and to send its employees' emails to customers conveying account information, marketing offers, and the like.  Meanwhile, emails from the domain "@wellsfargo.net" get routed to junk, because of the likelihood these reflect phishing rather than legitimate emails.

companies how to ensure their emails <u>do not</u> get junked by Email Clients' protective settings.  The bedrock of this advice is to use consistently the same, recognizable domain name to send emails.

11.     The "Trustpilot.com" domain is one of the most recognizable on the internet.  In addition to housing Trustpilot's Website, Trustpilot.com serves as a sending platform for the company as well as individual email accounts of Trustpilot personnel.

12.     Upon enrolling for a Trustpilot Subscription, customers immediately begin receiving a stream of emails from Trustpilot personnel whose addresses end in "@trustpilot.com." Communications from Trustpilot—from the message to new customers at the time initial subscription enrollment, to messages with marketing offers—are sent from Trustpilot.com.  All emails sent from Trustpilot.com went to recipients' inboxes, because the Email Clients and/or Email Users[3] recognized them as authentic (i.e., not phishing).

13.     The Trustpilot.com domain is Trustpilot's digital face, but Trustpilot also owns the separate Trustpilot.net domain (the "Shadow Domain").  In stark contrast to the Trustpilot.com domain, the Shadow Domain houses no website and serves as sending platform for no email address that Trustpilot disseminates publicly.  It has zero recognizability such as would satisfy the Email Clients' anti-junk features.  Moreover, as Trustpilot does not send normal communications from the Shadow Domain, emails sent from there are sent with the intent of confusing Trustpilot's customers as to their legitimacy even if they are observed after being sent.

14.     Trustpilot used renewal emails sent from the Shadow Domain to trap customers. Though all other Trustpilot-to-customer emails were sent from Trustpilot.com, Trustpilot used the

---

[3]  Even if the Email Clients do not route suspicious incoming emails to junk, any reasonably prudent Email User seeing in their inbox for the first time an email from an unrecognized domain would mistrust it as junk.  Similarly, many Email Users employ a "recognized address" tool to help screen out emails originating from untrustworthy sources.

Shadow Domain to send the renewal-reminder emails.  These emails summarily stated that customers would be auto-enrolled for another year's subscription (the "Auto-Enroll Emails"). Being from an unknown Trustpilot.net address—rather than Trustpilot.com—the Auto-Enroll Emails went straight to junk.  Customers did not realize they had been "enrolled" for another year until it was too late.

15.    Thousands of customers were forced to pay for Trustpilot Subscriptions they did not consent to—and often did not want—due to Trustpilot's using the Shadow Domain to send the Auto-Enroll Emails.  Plaintiffs, upon claims against Trustpilot for violations committed during this scheme, seeks damages including repayment of unlawfully obtained moneys, on behalf of all Subscribers who were sent renewal emails from Trustpilot.net (the "Class").

## JURISDICTION AND VENUE

15.    This Court has jurisdiction over all the claims under 28 U.S.C. § 1332(d), the Class Action Fairness Act of 2005 ("CAFA"), in that "the matter in controversy exceeds the sum or value of $5,000,000, exclusive of interests and costs, and is a class action in which . . . any member of a class of plaintiffs is a citizen of a state different from any defendant."  Jurisdiction over state law claims is further proper under 28 U.S.C. § 1367.

16.    Venue is proper within this District pursuant to 28 U.S.C. § 1391(a)(2) in that Defendant has transacted substantial business within this District and within the State of New York.  An assignor of Plaintiff Trustpilot Damages LLC resides within this District; and numerous acts and practices complained of herein took place in this District.

## **PARTIES**

17.     Plaintiff Trustpilot Damages LLC is an Iowa limited liability company and maintains an office location at New York, NY.  Plaintiff Trustpilot Damages LLC was formed to obtain justice for Trustpilot subscribers affected by the violations described herein.  It is assignee of all rights, title, and interest, validly and irrevocably assigned, of all causes of action possessed by at least one Trustpilot customer subjected to the violations described herein.  Such causes of action encompass those arising from contractual agreements and/or sounding in tort.

18.     An assignor of present claims to Plaintiff Trustpilot Damages LLC is headquartered in this District, regularly transacts and conducts business (including with Defendant) in New York State and New York City, and acted as a consumer with respect to its Trustpilot Subscription.

19.     The assignor, which uses Gmail as its Email Client:

   a.   Acquired a Trustpilot Subscription on November 20, 2017;

   b.   Received more than one hundred emails from addresses under the Trustpilot.com domain beginning November 20, 2017;

   c.   Was sent an Auto-Enroll Email on October 15, 2019 from the Shadow Domain;

   d.   The October 15, 2019 Auto-Enroll Email from the Shadow Domain was flagged as junk and was not found and not read until it was too late to cancel.

20.     Plaintiff Tumbaco Inc. d/b/a Quasar Expeditions ("Quasar") is a Florida corporation and maintains an office location in Miami, FL.  Quasar organizes land and sea travel experiences in South America.  Quasar, a Trustpilot customer, has been subjected to the violations described herein.

21.     Quasar, which uses Outlook as its Email Client:

   a.   Acquired a Trustpilot Subscription on or about March 12, 2015;

   b.   Received more than one hundred emails from addresses under the Trustpilot.com

domain beginning on or about March 12, 2015;

   c.   Was sent an Auto-Enroll Email on March 12, 2018 from the Shadow Domain;

   d.   The March 12, 2018 Auto-Enroll Email from the Shadow Domain was flagged as

junk and was not found and not read until it was too late to cancel.

22.     Defendant Trustpilot Inc. is a Delaware corporation with its principal place of

business at 5 Penn Plaza, 6th Floor, New York, NY 10001.  Trustpilot Inc. is a wholly owned

subsidiary of Non-Party Trustpilot A/S.

23.     Trustpilot A/S is a corporate entity organized under Danish law and with its

principal place of business in Copenhagen, Denmark.  Trustpilot A/S has defined itself in company

annual reports as the "parent" of various similarly named, regionally based, wholly owned

subsidiaries, with Defendant Trustpilot Inc. designated as responsible for U.S. operations.

24.     On or about March 25, 2021, Trustpilot A/S became a subsidiary of Non-Party

Trustpilot Group plc through corporate reorganization connected to Trustpilot's March 23 initial

public offering in London (the "IPO").  Trustpilot Group plc was incorporated February 8, 2021,

under the law of England and Wales, as the public entity in which shares would be offered.

25.     From Trustpilot offices in this District, Trustpilot committed acts complained of

herein, including:

   a.    creating or directing the creation of the Auto-Enroll Emails, and causing them to

be sent to members of the Class through the Shadow Domain, such that they went

unseen by customers;

   b.   administering the Subscriptions such that a minority of high-paying, preferred

customers received extraordinary benefits which exploited Trustpilot's integrity—

and which Trustpilot knew would, if uncovered, diminish the overall value of Subscriptions generally, because of repercussions including Google's restriction on Trustpilot content visibility in search results.

### TRUSTPILOT'S PRESSURE TO EXPAND

26.    Tech startups that enjoy initial success soon face intense pressure to expand or perish—and this is even more acute for European outfits like Trustpilot.  If they cannot show investors they are able to compete with American companies in the U.S. market, they risk being categorized as sclerotic and unworthy of funding.

27.    Trustpilot was nurtured from infancy into global competitiveness by generous lashings of state aid.  In 2011 Trustpilot received its first major venture investments, totaling 25 million Danish krone (nearly $5 million at that time), through Vaekstfonden, Denmark's national investment fund.[4]

28.    More funding, from private investors, came as Trustpilot's Website's traffic swelled and the number of consumer reviews of businesses increased.  The Website seemed to fill holes in the online-review space left by Yelp, whose focus is on bricks-and-mortar businesses (particularly restaurants), and TripAdvisor, whose focus is on hotels and the like.  Consumer reviews of other businesses, such as a bank's online services, were unavailable or difficult to find. Trustpilot's founders recognized this market need, and designed its review system to be better suited to reviews of services firms relying on an online presence.  Exposure through consumer reviews was especially valuable to middle-market and small services firms struggling for online

---

[4]  *See* Vaekstfonden Report re Trustpilot, *available at*
https://translate.google.com/translate?hl=en&sl=da&u=https://vf.dk/cases/trustpilot/&prev=search&pto=aue.

visibility. Trustpilot focused on such firms in developing its business model of selling Subscriptions.

29. By 2012, Trustpilot's gross profit was up nearly 250% from 2011, to roughly $5.15 million.[5] But, as for many high-traffic online startups, net profits eluded Trustpilot, because the marketing costs of luring site use through free content and access outweighed revenues from Subscriptions. Trustpilot sustained a loss of $2.07 million in 2011; five years later it lost $26.7 million, and losses continued to mount.[6]

30. Meanwhile, Trustpilot's public well of funding dried up, with the Danish state winding down the capital initiative benefiting Trustpilot in 2018.[7] Without the state's safety net, Trustpilot had to show unbiased private investors that, though loss-making, it was on the road to profitability. The problem was that user engagement and Subscriptions in the U.S. lagged. Trustpilot consistently has earned roughly a quarter of its traffic from visitors in the U.K.—its largest single-country market—compared to roughly 15% from the U.S.[8] Similarly Trustpilot has struggled to attract U.S. subscribers, according to company-published figures on Subscription revenue (shown in the table at the top of the following page)[9]:

---

[5] *See* Trustpilot Ann. Rep't of 2012, at 11.

[6] *Compare id.*, *with* Trustpilot Ann. Rep't of 2019, at 4.

[7] *See* Interview of CEO of PreSeed Ventures, StartUpGeeks.it, Nov. 13, 2019 (early-stage investor in Trustpilot discusses changes to Danish state-aid schemes for tech startups), https://www.startupgeeks.it/christel-piron-interview/.

[8] *See* Alexa.com Analysis of Trustpilot, https://www.alexa.com/siteinfo/trustpilot.com#section_traffic.

[9] *See* Trustpilot Ann. Rep't of 2019, at 36. Trustpilot's income stream has always been Euro-focused, with that market accounting for roughly two-thirds of revenues historically. *See, e.g.*, Trustpilot Ann. Rep't of 2017, at 22.

|  | **2018** | **2017** |
|---|---|---|
| **U.K.** | $ 23.5M | $ 16.7M |
|  | *[4.07 % incr.]* | |
| **U.S.** | $ 19.2M | $ 15M |
|  | *[2.70 % incr.]* | |

31.     Trustpilot was eager to beat back "more aggressive American competitors" by listing publicly to tap deeper capital.  This goal was impossible until Trustpilot justifiably could be labeled a "unicorn"—capable of a $1 billion valuation for purposes of initial public offering.[10] Investor interest in a European startup's flotation leaps once it is deemed a unicorn.  Unicorns are common among U.S. (151 at present) and Chinese (83) startups, but not Europe's (33).  None of the ten largest unicorns by valuation or funding raised is European; the most valuable European unicorn (as of late 2020, Global Switch, $11.1 billion) would not crack the U.S.'s top ten list.[11] For marketing reasons alone, listings of European startups valued at less than $1 billion are avoided.[12]

32.     In order to shake off its growing pains and establish itself as a global threat, Trustpilot had to increase revenues, in particular the share from U.S. operations.

**TRUSTPILOT'S INTEGRITY SCANDALS AND SUBSCRIBER CANCELLATIONS**

33.     Critics for years wondered whether Trustpilot's Subscriptions allowed businesses to game the review system.  In late 2018 through 2019, investigations by top journalists in the

---

[10]  *See* Interview of Trustpilot Exec. Bd. Co-Chair, Sifted.eu, Sept. 23, 2019, https://sifted.eu/articles/trustpilot-reviews-online-business/.

[11]  *See* CB Insights Analysis of Most Valuable Unicorns, Aug. 18, 2020, https://s3.amazonaws.com/cbi-research-portal-uploads/2020/08/19144419/Top-Unicorns-8-19v3-05-final.png.

[12]  *See* "The 12 European tech startups most likely to IPO next", Sifted.eu, Sept. 28, 2020, https://sifted.eu/articles/which-european-startups-will-ipo/.

U.K., Trustpilot's biggest single-country market, confirmed that Trustpilot has an integrity problem.

34.     According to these investigations, preferred subscribers were able to have negative reviews blocked or suppressed.  Meanwhile, smaller businesses solicited by Trustpilot got no preferential treatment for their subscriptions, which cost them a much greater share of their tight budgets.  Trustpilot never told these customers about the preferred class of high-paying customers, because Trustpilot knew these smaller businesses could not afford the cost Trustpilot charged for the preferred benefits, and because Trustpilot wished to limit the number of individuals who knew about the preferred benefits (which had to be kept secret).

35.     Trustpilot's business model attracted skepticism from the outset due to opacity surrounding (1) how reviews were removed after being flagged, and (2) how much control over reviews' visibility a Subscription conferred.  As to flagging, Trustpilot's user guidelines allowed any visitor to the Website to propose a review for deletion.  This ostensibly enabled "crowdsourced" policing against offensive language, gibberish text by bots, and the like.  But it also allowed companies to propose negative reviews against them be removed.  Trustpilot was the ultimate arbiter on removal, yet had a commercial interest in siding with a subscribing business over one of the countless review-writers who do not provide Trustpilot revenue directly.

36.     As to control over reviews' visibility, the basic Trustpilot Subscription—currently $2,400 per year—gives customers the right to reproduce positive reviews, and/or display Trustpilot-created "badges" showing good ratings, on their own websites and social media.  But the investigations revealed that "larger business[es]" were offered Trustpilot's "Enterprise" and

other bespoke Subscriptions, costing untold more thousands of dollars and providing help with "manag[ing] your reputation" that Trustpilot has not publicly detailed.[13]

### A.  The BBC's Investigation Into Review Removal

37.     On October 17, 2019, the BBC's "Watchdog" program aired an investigative special detailing how financial companies that had been blacklisted by the British government's consumer protection agency—but were paying Trustpilot subscribers—were able to block any mention of their disrepute on the Website.[14]   The entries on the Website devoted to these businesses failed to disclose they had run afoul of the U.K.'s Financial Conduct Authority ("FCA").   Instead, the reviews and ratings were often glowing.   BBC's Watchdog further found that when reviewers posted on Trustpilot about a company's inclusion on the FCA blacklist, the company flagged the review for removal, and Trustpilot complied.

38.     A digital commerce expert commissioned by the BBC to assess Trustpilot's business model stressed that Trustpilot "earn their money from the businesses that use the platform, not from the consumers. . . .   If you were setting up a financial services company and you wanted to very quickly paint a very positive picture of the company online, that really would be very simple to do . . . ."

### B.  The Times' *Investigation Into Review Suppression*

39.     On March 22, 2019, *The Times* published a report showing how the wealthiest Trustpilot subscribers—middle-market companies able to pay tens of thousands of dollars a year

---

[13]  *See* Trustpilot Plans & Pricing, https://business.trustpilot.com/plans?utm_source=bing&utm_medium=cpc&utm_term=trust20pil ot20usa&utm_content=81707523185486&utm_campaign=bing_brand-all-en_requestdemo_us_1017.

[14]  *See* Summary of Oct. 17, 2019 Report, BBC One Watchdog, https://www.bbc.co.uk/programmes/articles/3SkLXs4RK24Lzx0sPYXVRpg/trustpilot.

beyond the basic-subscription rate aimed at small businesses—were gaming the review system with Trustpilot's help.[15]

40.     *The Times* analyzed roughly 200,000 Trustpilot reviews to detect patterns in prevalence and visibility of favorable reviews for businesses paying for Subscriptions, versus those that did not.  To demonstrate how certain Trustpilot subscribers gained an advantage, the report compared reviews on rival companies in the U.K.'s real estate brokerage market.  Three U.K. firms have for years competed to top this market: Countrywide PLC, Foxtons Group PLC, and PurpleBricks Group PLC.  All are of similar size by market cap, and no recent scandals or events mean one is likelier to have a markedly worse reputation than the others.  Yet Countrywide, not a Trustpilot subscriber, had 123 reviews on its page on the Website, and an overall rating of one out of ten.  Meanwhile, paying subscribers PurpleBricks had 62,000 reviews and a rating of 9.5 out of ten, and Foxtons had 467 reviews and similarly stellar rating.

41.     Many of the reviews about PurpleBricks and Foxtons were obvious fakes, with multiple positive reviews containing identical text appearing on the Website contemporaneously.  Trustpilot had always insisted it employed mechanisms for identifying bogus reviews—robust ones, it assured—but the shams identified by *The Times* were so self-evident they would have been noticed by any such system.  Trustpilot looked the other way as well-funded customers paying for "Enterprise" and similar bespoke treatment manipulated their overall reputation and ratings by arranging for enough positive reviews to outweigh any negative ones.

---

[15] *See* "Estate agents and banks 'gaming' feedback website Trustpilot", *The Times*, Mar. 22, 2019, https://www.thetimes.co.uk/article/estate-agents-and-banks-gaming-feedback-website-trustpilot-jxjxjt02x; *see also* "Purplebricks and Foxtons accused in The Times as 'gaming' Britain's biggest consumer feedback site", *Property Industry Eye*, Mar. 25, 2019, https://propertyindustryeye.com/purplebricks-and-foxtons-accused-in-times-as-gaming-britains-biggest-consumer-feedback-site/.

42.     Trustpilot's preferred subscribers also had a way to suppress negative reviews by ensuring that positive reviews were more visible on search and social media.  All Trustpilot subscribers are able to automatically reproduce reviews within their own websites and social media accounts.  But expensive "add-ons" to Subscriptions allow wealthier customers to filter negative reviews out of those reproductions.  This form of online-reputation inflation is effective, especially for companies with relatively popular websites and social media presence, because it increases the odds that search engine results will show a positive review in response to a consumer query.  Effectively, the negative reviews show up in search results only if the consumer intentionally searches for them.

43.     The investigations by the BBC and *The Times* made the non-preferential Subscriptions held by most Trustpilot customers even less valuable than they had been.  In addition to eroding customer faith in the product, the exposés reduced the value of positive reviews, because consumers learned Trustpilot permits inauthentic reviews to permeate the Website.

### C.  *Google Targets Trustpilot Results In Its Fight Against "Self-Serving" Reviews*

44.     In the wake of the BBC and *Times* reports, in September 2019 Google announced a campaign to prevent "self-serving reviews" contaminating search results.  Google's predictable reaction to false reviews meant Trustpilot could no longer deliver a basic degree of search-result visibility it had promised customers, many of them small businesses on tight budgets, eager for better name recognition and uninvolved in false reviews.

45.     Google's September 2019 change affected how "rich snippets" of Trustpilot content are embedded within search-query results.  In the example appearing at the top of the following page, the stars, the "Rating", and the other reputational information in the line next to the arrow are the rich snippets for one pre-change Google search result of a particular business:



46.     Before Google's change, all Trustpilot Subscriptions conferred the benefit of having rich snippets embedded in <u>all</u> search results referencing a business's Trustpilot rating— even if those search results were from websites controlled by the business itself.   Following Trustpilot's integrity scandals, Google categorized such rich snippets as "self-serving" content prone to mislead consumers.   Google's remedy was to block all embedding of Trustpilot rich snippets, except in results from Trustpilot's Website.   The diagram below illustrates the change:



47.     Google's change was effective in that high-paying Trustpilot subscribers could no longer use their own large websites and social media presence to suppress negative reviews' visibility in search results.   But the change was overinclusive in that Trustpilot customers who never had tried to game the review system lost the primary benefit of their Subscriptions. Trustpilot tried to assuage them, insisting the damage was not as bad as it seemed.[16]   But customers

---

[16]  *See* "Google Rich Snippet update: What it means for businesses", Trustpilot.com, Sept. 17, 2019, https://business.trustpilot.com/reviews/get-seen-in-search/google-rich-snippet-update-what-it-means-for-businesses.

were unimpressed, and many determined not to subscribe another year.   As one customer complained online:



03/23/2020

Due to a change in relationship with Google, TrustPilot was unable to provide the services we initially signed up for. During this time they continued to offer these benefits on their website. I have emails from numerous representatives of this business that acknowledge these claims. We called to cancel in October and paid our final bill on October **. On January **** we received an additional bill despite their failure to provide the services in our contract and our numerous requests to cancel with our rep and their customer support team in October. Now their salesperson are harassing is and threatening collections for services they did not provide.

48.    The only way Trustpilot could ensure its Subscription base did not collapse suddenly was to trap the Class's unsuspecting customers into another year without their knowledge.

## TRUSTPILOT USES ITS SHADOW DOMAIN TO SEND AUTO-ENROLL EMAILS

49.    Trustpilot knew that, to make the trap work, it had to prevent its subscribers from seeing its auto-renewal emails.   Trustpilot thus sent the Auto-Enroll Emails from the Shadow Domain, so that they were flagged as junk by the Email Clients and thus never seen by the customers.[17]

50.    Yet prior emails to customers before the Auto-Enroll Emails were sent from Trustpilot.com, so that the Auto-Enroll Emails were marked as emanating from a suspicious source, and routed to junk.   First, the Customer received a series of emails from addresses under the Trustpilot.com Domain at the time of, and immediately after, first taking out a Subscription. All pre-Subscription emails—such as those to arrange online demos by Trustpilot "account development representatives"—were sent from addresses bearing the name of individual Trustpilot employees and under the Trustpilot.com domain.   Further, the emails to effectuate

---

[17]  Even if the customers somehow did see them, the customers themselves would disregard them as junk because they came from the unrecognized Shadow Domain.

Subscription enrollment—such as those providing customers a Subscription-activation link—also came from Trustpilot.com domain addresses of Trustpilot employees.

51.     Second, after buying a Subscription, the Customer received hundreds of emails from Trustpilot.com addresses of Trustpilot employees, conveying various marketing offers. Trustpilot vigorously sought to upsell customers on costly Subscription extras that promised to boost online reputation.

52.     Third, when the Customer's existing Subscription was two weeks away from expiry, a Trustpilot "customer success manager" sent the Customer an Auto-Enroll Email <u>from a Shadow-Domain address</u>, such that the Customer's Email Client would designate the Auto-Enroll Email as junk (or the Customer would themselves disregard it as junk).  The Auto-Enroll Email then summarily stated the Customer's "plan will renew," without further detail about when, under what terms, and subject to what cancellation protocols, renewal would occur.  The Auto-Enroll Email did not assert that the Customer's existing Subscription for the preceding year permitted Trustpilot to automatically renew for another year.

53.     Fourth, the day before commencement of the renewal the same customer success manager sent the Customer an email from that employee's <u>Trustpilot.com domain address</u> (the "Cover-Up Email").  The Cover-Up Email did not reference the Auto-Enroll Email nor that Trustpilot was about to impose auto-renewal without consent.  Rather, it merely stated that the customer success manager was available to assist the Customer if needed.

54.     Finally, upon commencement of the renewal surreptitiously imposed by Trustpilot, the Customer's bank account already on file with Trustpilot was charged for a new year of Subscription.

55.     Trustpilot has made it difficult if not impossible for Class members to cancel Subscriptions following auto-renewal.  For example, when Plaintiff Quasar complained it had been auto-renewed without its awareness or permission for another year's Subscription it did not want, Trustpilot threatened legal action if Plaintiff did not pay.  Even if Plaintiff sought to cancel against Trustpilot's cooperation, this risked Trustpilot's reducing the online visibility of positive reviews of Plaintiff.[18]

56.     While the Class of Trustpilot customers subjected to the treatment described above are located throughout the world, the majority are U.S.-based, according to data from URLScan.io tracking online activity connected to Trustpilot's Shadow Domain.[19]  As discussed below, the Auto-Enroll email sent from the Shadow Domain helped Trustpilot boost revenue for 2019—especially those attributable to its U.S operations—despite the BBC and *Times* reports and the Google changes.

## TRUSTPILOT GOES PUBLIC AS A UNICORN

57.     Trustpilot's revenues swelled in 2019 ($82 million) compared to 2018 ($64.3 million).  Also, the share of revenues attributable to U.S. Subscription sales was finally coming

---

[18]   The following are the dates on which Plaintiff Trustpilot Damages LLC's assignor was subjected to above-described events: (1) Nov. 17–20, 2017 (original subscription; related emails sent to Customer from addresses under the Trustpilot.com domain); (2) Nov. 20, 2017–Oct. 14, 2019 (numerous marketing and promotional emails sent to Customer from the Trustpilot.com domain); (3) Oct. 15, 2019 (Auto-Enroll Email sent to Customer from the Shadow-Domain); (4) Oct. 31, 2019 (Cover-Up Email sent to Customer from the Trustpilot.com domain ); (5) on the twentieth of each month from Nov. 20, 2019 through Apr. 20, 2020 (approximate)  (Customer's bank account is charged, even after Customer contacts Trustpilot to question all charges from October 2019 and on).  The corresponding dates for Plaintiff Quasar are: (1) Mar. 12, 2015, approximately (original subscription; related emails sent from Trustpilot.com); (2) Mar. 12, 2015–Mar. 11, 2018, approximately (numerous emails from Trustpilot.com); (3) Mar. 12, 2018 (Auto-Enroll Email from Shadow-Domain); (4)  monthly from May 2018 through present (bank account charged, even after Plaintiff disputes auto-renewal Subscription).

[19]   *See* URLScan.io Report on Trustpilot.net, https://urlscan.io/domain/trustpilot.net.

close to matching those from the U.K., its largest market historically, in both amount and pace of growth:

|       | **2019** | **2018** |
|-------|----------|----------|
| **U.K.** | $ 30.6M | $ 23.5M |
|       | *[30.4 % incr.]* | |
| **U.S.** | $ 24.7M | $ 19.2M |
|       | *[29 % incr.]* | |

58.     On Oct. 8, 2020, media reported that Trustpilot had solicited various major investment banks specializing in initial public offerings to assist with a London listing, telling them it had finally reached $100 million in annual sales, which meant it could claim a $1 billion valuation and thus go public as a unicorn.[20]

59.     Trustpilot's IPO plans continued apace through late 2020 and early 2021.  Within days of Trustpilot's March 23, 2021 IPO in London, shares-in-issue in Non-Party Trustpilot Group plc (ticker "TRST" on the London Stock Exchange) totaled approximately 409 million, and its market cap was approximately $1.49 billion.[21]

## THE AUTO-ENROLL EMAILS WERE NO INNOCENT MISTAKE

60.     Trustpilot knew when it sent the Auto-Enroll Emails they would go unread, because <u>any</u> company that routinely emails customers as part of its business knows using an irregular sender domain, like the Shadow Domain, guarantees such messages will go to junk.[22]

---

[20]  *See* "Online reviews platform Trustpilot plots £800m London float", Sky.com, Oct. 8, 2020, https://news.sky.com/story/online-reviews-platform-trustpilot-plots-800m-london-float-12099161.

[21]  *See* "Share Price & Information: Trustpilot Group plc (TRST)", SharesMagazine.co.uk, Mar. 29, 2021, https://www.sharesmagazine.co.uk/shares/share/TRST.

[22]  Some commentators distinguish between "junk" and "spam" email under various proposed definitions, but "junk" as used herein encompasses all email marked by an Email Client or an Email User as unsolicited.  *See, e.g.*, "Entry re "Spam", *PCMag.com* Encyclopedia, https://www.pcmag.com/encyclopedia/term/spam.  This includes emails so marked because they

61.     Even if Email Clients did not deploy measures to detect such telltale signs of nefarious content,[23] the reasonably prudent email user would know from experience and/or prior warnings that an email from a never-before-seen sender domain is not to be trusted.[24]  In any event, the Email Clients were programmed to be on the lookout for unrecognized-source messages like the Auto-Enroll Emails.

62.     Moreover, Trustpilot rigged the Shadow Domain's infrastructure such that any emails emanating therefrom were bound to be marked junk.  There are several email-authentication protocols used to separate junk from inbox-worthy emails.  The most important of these is Domain-based Message Authentication, Reporting, and Conformance ("DMARC").   DMARC was authored collectively by Email Clients, social media firms, and large companies which regularly email consumers (mainly banks), with input from government and academia.[25]  Operators and owners of domains comply with DMARC—thus ensuring their emails do not get routed to junk—by inserting particular bits of code in their domain infrastructure and publicly recording this code.  Any information-technology professional knows failure to so properly authenticate a domain under DMARC means its emails will go to junk.[26]

---

are regarded as falsely representing (1) that they are from a trustworthy source, i.e., phishing, or (2) that an Email User affirmatively requested the communication, e.g., Gmail sorts solicited emails into an Email User's "Primary" tab, and unsolicited junk, into "Promotions" and various other such tabs.

[23]  *See, e.g.*, "Email Impersonation Scams: What You or Your IT Staff Can Do to Protect Your Business", Iron Bastion Security Blog, June 19, 2018, https://blog.ironbastion.com.au/email-impersonation-scams-phishing-what-your-staff-can-do/.

[24]  *See, e.g.*, "Clever fake domain names can trick anyone", *Beaming's Business Guide to Cyber Security*, Nov. 26, 2018, https://www.beaming.co.uk/knowledge-base/clever-fake-domain-names-can-trick-anyone/.

[25]  *See* FAQ re DMARC, https://dmarc.org/wiki/FAQ.

[26]  *See, e.g.*, "How to Prevent Emails from Going to Spam: The Ultimate Guide," SendPulse.com, May 18, 2020, https://sendpulse.com/blog/prevent-emails-landing-spam-folder.

63.     Trustpilot failed to properly authenticate the Shadow Domain under DMARC. DMARC tells businesses like Trustpilot to take a number of steps to implement DMARC across multiple domains that they control and wish to use successfully as sending domains (i.e., emails sent from the domain go to inbox and not to junk).  Such steps include the following:

64.     First, DMARC says to use a particular code to ensure DMARC compliance across multiple domains at once.  This code effectively clarifies that a lesser-used domain with low or zero presence online—like Trustpilot's Shadow Domain—is linked to a prominent domain—like the Trustpilot.com domain.  This particular code appears above the arrow in the below exemplar coding line created by DMARC, to be used by businesses wishing to DMARC-certify both a ".net" domain and a ".com" domain:

```
_dmarc.example.com. IN TXT "v=DMARC1; p=none; rua=mailto:dmarc-rua@example.com"
_dmarc.example.net. IN CNAME _dmarc.example.com.
*._report._dmarc.example.com IN TXT "v=DMARC1"
```

65.     As shown below, Trustpilot did not do what DMARC said when completing the DMARC record for the Trustpilot.com domain (the upper line of code reproduced below) and the Shadow Domain (lower line):

```
v=DMARC1; p=reject; rua=mailto:noreply-dmarc@trustpilot.com
```

```
v=DMARC1; p=none; rua=mailto:noreply-dmarc@trustpilot.com
```

66.     Second, DMARC says to use another specific coding to ensure all email-activity reports about domains are reaching their owner/operators.  Businesses are expected to scrutinize these reports for instances of junk sent under their name, as sophisticated criminals can temporarily hijack domains and/or individual-employee email addresses.

67.     If a domain's DMARC record is not coded such that all other internet users can see that the domain is participating in the reporting process—and thus in the internet-wide effort against junk—the domain cannot be DMARC compliant.  There is a particular code to ensure an owner/operator responsible for multiple domains receives reports for <u>all</u> domains. This particular code appears next to the arrow in the following exemplar coding line created by DMARC:

```
_dmarc.example.com. IN TXT "v=DMARC1; p=none; rua=mailto:dmarc-rua@example.com"
_dmarc.example.net. IN CNAME _dmarc.example.com.

*._report._dmarc.example.com IN TXT "v=DMARC1"
```

68.     As reflected in the Trustpilot DMARC coding reproduced in Paragraph 60 above, Trustpilot did not enter the particular code to ensure reports about the Shadow Domain were included with reports about the Trustpilot.com domain.[27]

69.     Third, DMARC prescribes that, after a domain has been used to send emails for a period of time sufficient to establish a reputation as a legitimate email-sender, the domain's coding must soon be amended such that the "policy" portion of the coding is changed from "p=none" to "p=reject".

70.     The "p=none" code means the domain is not requesting email recipients take any negative course of action even if the domain appears DMARC-noncompliant.  All new domains are coded as "p=none", lest their newness be mistaken for lack of trustworthiness.  The "p-reject" code means the domain has had time to establish a track record of authenticity online, and to understand its email-activity reports, and is now asking recipients to automatically reject any emails seemingly emanating from it, but that raise any of DMARC's various red flags.  Essentially,

---

[27]   Trustpilot included in the Shadow Domain's DMARC coding an email address within the Trustpilot.com domain ostensibly to be used for sending reports.  *See* ¶ 60.  But, without the particular coding to <u>ensure</u> transmission, reports about the Shadow Domain could not transmit as DMARC requires, meaning the Shadow Domain was DMARC noncompliant.

the "p=reject" coding is a requisite sign of good faith demonstrating the domain is not a vehicle for junk.

71.     As reflected in the Trustpilot DMARC coding reproduced in Paragraph 60 above, Trustpilot coded the Trustpilot.com domain as "p=reject", but left the Shadow Domain coded "p=none" long after a DMARC-compliant domain would have transitioned to "p=reject".

72.     Taken together, these deviations from DMARC protocol mean that the Shadow Domain has not been recognized as an authentic sending domain by recipients (including Email Clients responsible for managing most email traffic), and that emails sent from it, namely the Auto-Enroll Emails, have been routed to junk.

73.     In short, Trustpilot knew when it sent the Auto-Enroll Emails from the Shadow Domain they would go to junk.  That is why the Auto-Enroll Emails were sent from the Shadow Domain, Trustpilot did not use the Shadow Domain to send other emails, and the Shadow Domain was structured so as to be regarded by recipients as a source of junk.

## PLAINTIFFS' DAMAGES

74.     The Class represented by Plaintiffs have suffered monetary damages in the form of monthly payments for another year of Subscription that they had not agreed to and either did not want or might not have wanted, but that Trustpilot unlawfully imposed upon them via the Auto-Enroll Emails.  Neither Plaintiff Quasar nor Plaintiff Trustpilot Damages LLC's assignor described above wanted to renew its Subscription.

75.     The Class have also been harmed by Trustpilot's imposition through the Auto-Enroll Emails of a higher rate for Subscription than they had ever agreed to.

76.     The Class have also been harmed by having to spend time and resources calling and/or writing Trustpilot urging Trustpilot to cancel the Subscriptions that Trustpilot unlawfully imposed and reimburse moneys improperly taken in connection therewith.

### CLASS ACTION ALLEGATIONS

77.     This action is brought as a class action under Rule 23 of the Federal Rules of Civil Procedure.  Plaintiffs seek certification on behalf of a class of all persons or entities living in the United States to whom or which, within six years before the date of the commencement of this action (the "Class Period"), Trustpilot sent one of the Auto-Enroll Emails.

78.     Plaintiffs also seek certification on behalf of a sub-class of all individuals and businesses resident in New York who or that are members of the Nationwide Class (the "New York Sub-Class").

79.     Plaintiffs also seek certification on behalf of sub-classes of all individuals and businesses resident in each of the states identified in the Fourth Cause of Action below, who or that are members of the Nationwide Class (together, the "State Sub-Classes").  By way of example and without limitation, Plaintiff Quasar is a member of the Florida State Sub-Class.

80.     Collectively, the Nationwide Class, the New York Sub-Class, and the State Sub-Classes comprise, and are referred to herein as, "the Class."

81.     Excluded from the Class are Defendant, any parent, subsidiary or affiliate of any defendant, any entity in which any defendant has a controlling interest, and the respective officers, directors, employees, agents, legal representatives, heirs, predecessors, successors, and assigns of such excluded persons or entities.

82.     The Auto-Enroll Emails, which were prepared, approved, and disseminated by Trustpilot, failed to give this Class of customers notice that Trustpilot sought to enroll them for

another year's Subscription, and made it impossible for them to even attempt to cancel prior to the date on which Trustpilot began billing them for the new Subscription year without their having the chance to consent to it.

83.     Trustpilot utilized the deceptive practices described herein against customers nationwide, and uniformly, in that the Auto-Enroll Emails were created using email lists of existing Trustpilot customers, such that they could be sent to many customers automatically without manual input.

84.     This action is properly brought as a class action under Rule 23 for the following reasons:

a.   The Class consists of thousands of persons or entities and is thus so numerous that joinder of all members, whether otherwise required or permitted, is impracticable;

b.   There are questions of law or fact common to the Class which predominate over any questions affecting only individual members, including:

   i.   Whether the Subscriptions imposed by Trustpilot through the Auto-Enroll Emails are void and unenforceable under the law;

   ii.   Whether Trustpilot engaged in deceptive and misleading acts and practices in using the Auto-Enroll Emails to effectuate enrollment of Class members for another year's Subscription;

   iii.   Whether Trustpilot imposed automatic renewal and/or continuous provision of service previously rendered, without first obtaining Class members' affirmative consent to do so;

iv.   Whether Trustpilot failed to present the automatic renewal offer terms or continuous service offer terms in a clear and conspicuous manner before the Class members were enrolled for a new year's Subscription;

v.   Whether Trustpilot breached the terms of Class members' Subscriptions for the year prior to the unlawful auto-renewal described herein, because those prior Subscriptions did not provide for auto-renewal;

vi.   Whether Trustpilot breached its implied covenant of good faith and fair dealing with the Class members or otherwise engaged in unfair, fraudulent or wrongful business practices during the Class Period by using the Auto-Enroll Emails to renew Subscriptions;

vii.   Whether the Class members have sustained damages as a result of Trustpilot's wrongful conduct and, if so, what is the proper measure of such damages.

c.   The claims asserted by Plaintiffs are typical of the claims of the other members of the Class;

d.   Plaintiffs will fairly and adequately protect the interests of the Class, and has retained attorneys experienced in class and complex litigation as counsel; and,

e.   A class action is superior to other available methods for the fair and efficient adjudication of this controversy for at least the following reasons:

i.   given the complexity of the issues involved in this action, and the size of individual Class Members' claims, few, if any, Class Members could afford to seek legal redress individually for the wrongs Trustpilot committed against them;

ii.   when the liability of Defendant has been adjudicated, claims of all members of the Class can be determined by the Court;

    iii.    this action will cause an orderly and expeditious administration of the Class claims, economies of time, effort and expense will be fostered, and uniformity of decisions will be insured;

    iv.    without a class action, the Class Members will continue to suffer damages and Trustpilot's violations of law will proceed without remedy while Trustpilot continues to reap and retain the proceeds of its wrongful conduct; and

    v.    this action presents no difficulties that would impede its management by the Court as a class.

## FIRST CAUSE OF ACTION

### For Breach of Implied Covenant of Good Faith and Fair Dealing

85.    Plaintiffs repeat and reallege each and every previous allegation as if fully set forth herein.

86.    Trustpilot entered into contracts in the form of annual Subscriptions sold to Class members prior to such customers' receiving the Auto-Enroll Emails.

87.    Trustpilot breached the implied covenants of good faith and fair dealing in using deceptive means against the Class members—thereby directly and proximately causing Plaintiff's assignor and the other members of the Class damages in an amount to be determined at trial—by, inter alia:

    a.    endeavoring to impose another year's Subscription upon Plaintiff's assignor and the other members of the Class without their having had the opportunity to affirmatively consent to this;

b.  endeavoring to impose another year's Subscription upon the Class members despite the fact that the prior Subscriptions into which Class members entered did not permit Trustpilot to automatically renew for another year's Subscription;

c.  endeavoring to impose another year's Subscription upon the Class members at a rate greater than that of prior Subscriptions into which Class members entered, where neither those prior Subscriptions nor the terms offered through the Auto-Enroll Emails permitted Trustpilot to so raise rates;

d.  administering the Subscriptions such that a minority of high-paying, preferred customers received extraordinary benefits which exploited Trustpilot's integrity—and which Trustpilot knew would, if uncovered, diminish the overall value of Subscriptions generally, because of repercussions including Google's restriction on Trustpilot content visibility in search results;

e.  using the Shadow Domain to send the Auto-Enroll Emails, rather than the Trustpilot.com domain which recipients recognized as the source of authentic Trustpilot emails;

f.  failing to abide by DMARC protocol in coding the Shadow Domain's infrastructure, such that the Shadow Domain appeared to email recipients to be a source of junk;

g.  failing to present automatic-renewal offer terms (and/or continuous service offer terms) in a clear and conspicuous manner, and in visual proximity to the request for consent to the offer, either within the Auto-Enroll Emails or at any time prior to causing automatic renewal;

h.   charging Class members' credit or debit cards, and/or accounts with a third party, for automatic renewal (and/or continuous service) without first obtaining their affirmative consent to automatic renewal that Trustpilot endeavored to impose via the Auto-Enroll Emails;

i.   failing to provide an acknowledgment that includes the terms of automatic renewal on offer (and/or continuous service offer terms), cancellation policy, and information regarding how to cancel, in a manner capable of being retained by the consumer;

j.   presenting Class members an automatic renewal offer (and/or continuous service offer) without providing a toll-free telephone number, electronic mail address, a postal address, or another cost-effective, timely, and easy-to-use mechanism for cancellation.

## SECOND CAUSE OF ACTION
### For Breach of Contract

88.   Plaintiffs repeat and reallege each and every previous allegation as if fully set forth herein.

89.   Trustpilot entered into contracts in the form of annual Subscriptions sold to Class members prior to such customers' receiving the Auto-Enroll Emails.

90.   Trustpilot breached its contractual duties—thereby directly and proximately causing Plaintiffs and the other members of the Class damages in an amount to be determined at trial—by, inter alia:

a.  endeavoring to impose another year's Subscription upon the Class members despite the fact that the prior Subscriptions did not permit Trustpilot to automatically renew for another year's Subscription;

b.  endeavoring to impose another year's Subscription at a rate greater than that of prior Subscriptions into which Class members entered, where neither those prior Subscriptions nor the terms offered through the Auto-Enroll Emails permitted Trustpilot to so raise rates;

c.  administering the Subscriptions such that a minority of high-paying, preferred customers received extraordinary benefits which exploited Trustpilot's integrity— and which Trustpilot knew would, if uncovered, diminish the overall value of Subscriptions generally, because of repercussions including Google's restriction on Trustpilot content visibility in search results.

### THIRD CAUSE OF ACTION
### For Violation of New York General Business Law § 349
### (on behalf of the New York Sub-Class)

91.     Plaintiffs repeat and reallege each and every previous allegation as if fully set forth herein.

92.     Defendant and all agents, employees and representatives are prohibited from engaging in deceptive acts and practices pursuant to New York General Business Law § 349.  New York General Business Law § 349 prohibits deceptive acts as practices in the conduct of any business, trade or commerce or in the furnishing of any service in the State of New York and makes such acts and practices unlawful.

93.     Further, New York General Obligations Law § 5-903 specifically makes it unlawful for a business to automatically renew a services contract unless beforehand it expressly calls the customer's attention to a provision in the existing contract that permits such automatic renewal.

94.     Trustpilot's conduct, as outlined above, was egregious and directed specifically to its customers.  The conduct herein was part of a pattern and practice that was consumer-oriented, of a recurring nature, and directed at the public generally, including Plaintiff Trustpilot Damages LLC's assignor and the other members of the New York Sub-Class, which or who acted as consumers in all aspects of their dealings with Trustpilot and were without sophistication in, inter alia, the email-authentication processes described herein.

95.     Trustpilot's conduct was additionally consumer-oriented in that the unlawfully imposed Subscriptions meant Trustpilot reviews concerning the Class members continued to appear online directed at consumers (i.e., Class members' own actual or potential customers), to a greater extent than they would have been had the Auto-Enroll Emails improperly imposed new Subscriptions.

96.     This wrongful conduct, in and of itself, not only violated § 349.  It also violated § 5-903, and these violations in turn constitute additional violations of § 349.

97.     As a direct and proximate result of Trustpilot's violations of § 349, and of § 5-903, the New York Sub-Class have been actually damaged as alleged herein in an amount to be determined at trial.  And Defendant is liable for exemplary and punitive damages in order to protect the public by deterring future wrongdoing, in an amount to be determined at trial.

## FOURTH CAUSE OF ACTION

### For Violations of the State Unfair Business Practices Statutes
### (on behalf of the State Sub-Classes)

98.     Plaintiffs repeat and reallege each and every previous allegation as if fully set forth herein.

99.     The states identified below (hereinafter the "States") are among those which maintain consumer protection statutes proscribing the conduct by Trustpilot described herein. Certain States more specifically mandate by statute actions businesses must take in connection with efforts to automatically renew customers' existing subscriptions; Trustpilot violated these as well.  While there are superficial differences between the various statutes, all retain the same basic purpose and structure and impose the same sorts of duties on companies like Trustpilot as well as the same types of penalties.

100.     Trustpilot engaged in a nationwide scheme, using the Auto-Enroll Emails and the Shadow Domain, to trap Class members into new annual Subscriptions they did not agree to and might not have wanted.  Further, the new, unagreed-to Subscriptions imposed higher rates than the previous ones, without customer notice or consent.

101.     By engaging in this scheme against the members of the State Sub-Classes, Trustpilot violated the unfair business practices law of each State, as well as any statutes specifically controlling automatic renewals, as follows:

   a.   Ariz. Rev. Stat. Ann. §§ 44-1521 et seq. ("Consumer Fraud Act"), with respect to customers in Arizona.

   b.   Cal. Bus. & Prof. Code §§ 17200 et seq. ("Unfair Competition Law") & Cal. Civ. Code §§ 1750 et seq. ("Consumers Legal Remedies Act"), and Cal. Bus. & Prof. Code §§ 17602 (auto-renewal statute), with respect to customers in California.

c.  Conn. Gen. Stat. §§ 42-110a et seq. ("Unfair Trade Practices Act"), and § 42-126b (auto-renewal statute), with respect to customers in Connecticut.

d.  D.C. Code §§ 28-3901 et seq. ("Consumer Protection Procedures Act"), and § 28A-203(a)–(b) (auto-renewal statute), with respect to customers in the District of Columbia.

e.  Fla. Stat. §§ 501.201 et seq. ("Deceptive and Unfair Trade Practices Act"), and § 501.165 (auto-renewal statute), with respect to customers in Florida.

f.  Haw. Rev. Stat. §§ 481A-1 et seq. ("Uniform Deceptive Trade Practice Act"), and § 481-9.5 (auto-renewal statute), with respect to customers in Hawaii.

g.  815 Ill. Comp. Stat. 505/1 et seq. ("Consumer Fraud and Deceptive Business Practices Act"), and *id.* at 601/1–20, with respect to customers in Illinois.

h.  Minn. Stat. § 325F.67 ("False Statement in Advertising Act") & Minn. Stat. §§ 325F.68 et seq. ("Prevention of Consumer Fraud Act"), with respect to customers in Minnesota.

i.  N.J. Stat. Ann. §§ 56:8-1 et seq. ("Consumer Fraud Act"), with respect to customers in New Jersey.

j.  N.M. Stat. Ann. §§ 57-12-1 et seq. ("Unfair Practices Act"), and N.M. Code R. 12.2.11 (auto-renewal statute), with respect to customers in New Mexico.

k.  N.C. Gen. Stat. §§ 75-1.1 et seq. ("Deceptive Trade Practices Law"), and § 75-41 (auto-renewal statute), with respect to customers in North Carolina.

l.  N.D. Cent. Code §§ 51-15-01 et seq. ("Deceptive Trade Practices Law"), and § 51-37-01–51-37-06 (auto-renewal statute), with respect to customers in North Dakota.

m. Or. Rev. Stat. §§ 646.605 et seq. ("Unlawful Trade Practices Law"), and §§ 646A.292–295 (auto-renewal statute), with respect to customers in Oregon.

n. Utah Code Ann. §§ 13-11-1 et seq. ("Consumer Sales Practices Act"), and §§ 15-10-201–202 (auto-renewal statute), with respect to customers in Utah.

o. Vt. Stat. Ann. tit. 9, §§ 2451 ("Consumer Fraud Act"), and § 2454a (auto-renewal statute), with respect to customers in Vermont.

p. Wash. Rev. Code §§ 19.86.010 et seq. ("Consumer Protection Act"), with respect to customers in Washington State.

q. Wis. Stat. §§ 100.18 et seq. ("Deceptive Trade. Practices Act"), and § 134.49 (auto-renewal statute), with respect to customers in Wisconsin.

102.    As a result, Defendant is liable to the members of the State Sub-Classes, to the extent provided for by each State's law, for actual and statutory damages, as well as exemplary and punitive damages in order to protect the public by deterring future wrongdoing, in amounts to be determined at trial.

## FIFTH CAUSE OF ACTION
### For Unjust Enrichment

103.    Plaintiffs repeat and reallege each and every previous allegation as if fully set forth herein.

104.    Trustpilot derived substantial, unjustified and exorbitant sums for itself at the expense of the Class members after unlawfully imposing another year's Subscription via the Auto-Enroll Emails.

105.    As a result of Trustpilot's misconduct, Trustpilot has been unjustly enriched at the expense of the Class members.

106.    It is against equity and good conscience for Trustpilot to retain the sums gleaned via the Auto-Enroll Emails.

## PRAYER FOR RELIEF

WHEREFORE, by reason of, as cause of and in consequence of the misconduct engaged in by Defendant in the handling of Plaintiffs' accounts and monies, and pursuant to the Causes of Action set forth above and the law identified therein, Plaintiffs requests

(i)    compensatory and/or recessionary and other damages in an amount to be determined at trial;

(ii)    interest from the date of loss to the date of the award and payment of final judgment herein;

(iii)    reasonable attorneys' fees;

(iv)    costs, expert and witness fees; and

(v)    such other further and different relief as to the Court seems appropriate and just.

## JURY DEMAND

Plaintiffs demand a trial by jury.

Dated:    New York, New York
             Apr. 8, 2021

**FRANK LLP**

By:   */s/ Gregory A. Frank*
Gregory A. Frank (GF0531)
Marvin L. Frank (MF1436)
Asher Hawkins (AH2333)
305 Broadway, Suite 700
New York, New York 10007
Tel: (212) 682-1853
Fax: (212) 682-1892
gfrank@frankllp.com
mfrank@frankllp.com
ahawkins@frankllp.com

*Attorneys for Plaintiffs and the Class*