UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

_____

TRUSTPILOT DAMAGES LLC and TUMBACO INC. )
d/b/a QUASAR EXPEDITIONS, individually and )
on behalf of all others similarly situated, )

                              Plaintiff, )        No. 1:21-cv-432-JSR

        v. )

TRUSTPILOT INC., )

                          Defendant. )        **FILED VIA ECF**

_____

---

## PLAINTIFFS' MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANT'S MOTION TO DISMISS THE AMENDED COMPLAINT

---

**FRANK LLP**
305 Broadway, Suite 700
New York, New York 10007
(212) 682-1853 Telephone
(212) 682-1892 Facsimile

*Counsel for Plaintiffs and the Class*

## TABLE OF CONTENTS

I. STANDARDS ................................................................................................................ 3

    A.   Standards of Review ............................................................................................ 3

    B.  Legal Standards .................................................................................................. 4

II. BACKGROUND ........................................................................................................ 6

III. ARGUMENT ............................................................................................................. 9

    A.   New York Law Precludes Trustpilot's Auto-Renewal Scheme ................................... 9

    B.   Trustpilot Breached The Contract And Its Implied Covenants ................................. 10

    C.   Trustpilot Violated Statutory Protective Law ......................................................... 15

    D.   Defendant's Unauthenticated Exhibits Should Not Be Considered ........................... 21

    F.   Trustpilot's Miscellaneous Arguments All Fail ...................................................... 22

IV. CONCLUSION .......................................................................................................... 25

## TABLE OF AUTHORITIES

**Cases**

*511 W. 232nd Owners Corp. v. Jennifer Realty Co.*,
   98 N.Y.2d 144 (2002) ................................................................. 13

*Ambush Alarm & Elecs., Inc. v. 606 Second Ave. Rest. Corp.*,
   No. 16-2593, 2018 N.Y. Misc. LEXIS 1196 (2d Dep't Apr. 5, 2018) .......................... 9, 10, 11

*Angelo v. Fid. & Guar. Life Ins. Co.*,
   No. 18-cv-3224, 2019 U.S. Dist. LEXIS 12251 (D.N.J. Jan. 25, 2019).................................... 4

*Arnold v. Hearst Magazine Media, Inc.*,
   No. 19-cv-1969, 2021 U.S. Dist. LEXIS 25706 (S.D. Cal. Feb. 10, 2021)........... 15, 16, 18, 23

*Ashcroft v. Iqbal*,
   556 U.S. 662 (2009)..................................................................... 3

*Asimov v. Trident Media Group, LLC*,
   999 N.Y.S.2d 796 (Sup. Ct. N.Y. Cnty. 2014), ...................................................... 17

*Bell Atl. Corp. v. Twombly*,
   550 U.S. 544 (2007)..................................................................... 3

*BSC Assocs. v. Leidos, Inc.*,
   91 F. Supp. 3d 319 (N.D.N.Y. 2015)................................................................. 25

*Cafferty Clobes Meriwether & Sprengel, LLP v. XO Communs. Servs.*,
   190 F. Supp. 3d 765 (N.D. Ill. 2016) ............................................................. 12

*Carbo Indus. v. Coastal Ref. & Mktg.*,
   154 F. App'x 218 (2d Cir. 2005) ................................................................ 20

*Chambers v. Time Warner, Inc.*,
   282 F.3d 147 (2d Cir. 2002) ................................................................ 21, 22

*Cruz v. NYNEX Info. Resources*,
   263 A.D.2d 285 (1st Dep't 2000) .............................................................. 19

*Dean v. United of Omaha Life Ins. Co.*,
   No. CV 05-6067-GHK (FMOx),
   2007 U.S. Dist. LEXIS 99294 (C.D. Cal. Aug. 27, 2007).................................... 5, 10

*Donald Rubin, Inc. v. Schwartz*,
   160 A.D.2d 53 (1st Dep't 1990) ............................................................................ 20

*Eternity Global Master Fund Ltd. v. Morgan Guaranty Trust Co. of New York*,
   375 F.3d 168 (2d Cir. 2004) ................................................................................... 5

*Expo Sure USA v. Pita Lovers*,
   No. 0105108-17, 2019 N.Y. Misc. LEXIS 143 (Dist. Ct. Nassau Cnty. Jan. 16, 2019) .......... 20

*Haraden Motorcar Corp. v. Bonarrigo*,
   No. 19-cv-01079, 2020 U.S. Dist. LEXIS 68666 (N.D.N.Y. Apr. 20, 2020) ......................... 23

*Healthcare I.Q., LLC v. Tsai Chung Chao*,
   118 A.D.3d 98 (1st Dep't 2014) ........................................................................... 20

*Holmes v. Air Line Pilots Ass'n*,
   745 F. Supp. 2d 176 (E.D.N.Y. 2010) .................................................................. 22

*Hoover v. HSBC Mortg. Corp. (USA)*,
   9 F. Supp. 3d 223 (N.D.N.Y. 2014) ................................................................. 5, 13

*Hsu v. Puma Biotechnology, Inc.*,
   213 F. Supp. 3d 1275 (C.D. Cal. 2016) ............................................................... 21

*JPMorgan Chase Bank, N.A. v. IDW Grp., LLC*,
   No. 08 Civ. 9116, 2009 U.S. Dist. LEXIS 9207 (S.D.N.Y. Feb. 9, 2009) ............... 13, 14, 15

*Justinian Capital SPC v. WestLB AG*,
   28 N.Y.3d 160 (2016) ........................................................................................ 25

*King v. Bumble Trading, Inc.*,
   393 F. Supp. 3d 856 (N.D. Cal. 2019) .......................................................... 16, 18, 24

*Labajo v. Best Buy Stores, L.P.*,
   478 F. Supp. 2d 523 (S.D.N.Y. 2007) ................................................................. 10

*Ludl Elec. Prods. v. Wells Fargo Fin. Leasing, Inc.*,
   6 A.D.3d 397 (2d Dep't 2004) ............................................................................. 17

*Lussoro v. Ocean Fin. Fed. Credit Union*,
   456 F. Supp. 3d 474 (E.D.N.Y. 2020) ............................................................. 10, 12

*Marc J. Elkowitz, M.D., P.C. v. UnitedHealthcare of N.Y., Inc.*,
   No. 17-CV-4663, 2021 U.S. Dist. LEXIS 66114 (E.D.N.Y. Mar. 31, 2021) .................. 21, 22

*Matter of Wimbledon Fund, SPC (Class TT) v. Weston Capital Partners Master Fund II, Ltd.*,

    184 A.D.3d 448 (1st Dep't 2020) .......................................................................... 25

*Mazzola v. Roomster Corp.*,

    849 F. Supp. 2d 395 (S.D.N.Y. 2012) ............................................................. 12, 15

*Medicrea USA, Inc. v. K2M Spine, Inc.*,

    No. 17 Civ. 8677, 2018 U.S. Dist. LEXIS 110286 (S.D.N.Y. Feb. 7, 2018) .......................... 23

*Michelo v. Nat'l Collegiate Student Loan Tr. 2007-2*,

    419 F. Supp. 3d 668 (S.D.N.Y. 2019) ...................................................................... 6

*Miller v. Metro. Life Ins. Co.*,

    No. 17 Civ. 7284, 2018 U.S. Dist. LEXIS 195046 (S.D.N.Y. Nov. 15, 2018) ......................... 4

*Nick's Garage, Inc. v. Progressive Cas. Ins. Co.*,

    875 F.3d 107 (2d Cir. 2017) ........................................................................ 10, 16

*Oswego Laborers' Local 214 Pension Fund v. Marine Midland Bank, N.A.*,

    85 N.Y.2d 20 (1995) ..................................................................................... 18

*Ovitz v. Bloomberg, L.P.*,

    No. 603692/08, 2009 N.Y. Misc. LEXIS 6239 (Sup. Ct. N.Y. Cnty. Oct. 7, 2009) ............... 15

*Radiology & Imaging Specialists of Lakeland, P.A. v. FUJIFILM Med. Sys.*,

    2021 U.S. Dist. LEXIS 8366 (S.D.N.Y. Jan. 15, 2021) ........................................... 19

*Trust for the Certificate Holders of the Merrill Lynch Mortg. Inv'rs v. Love Funding Corp.*,

    13 N.Y.3d 190 (2017) .................................................................................... 25

*Underdog Trucking, LLC v. Verizon Servs. Corp.*,

    No. 09 Civ. 8918, 2010 U.S. Dist. LEXIS 72642 (S.D.N.Y. July 20, 2010) ....................... 14

*Universal Inv. Advisory SA v. Bakrie Telecom Pte., Ltd.*,

    154 A.D.3d 171 (1st Dep't 2017) ...................................................................... 25

*Vangorden v. Second Round, Ltd. P'ship*,

    897 F.3d 433 (2d Cir. 2018) ............................................................................. 3

*Verizon Directories Corp. v. Yellow Book USA, Inc.*,

    338 F. Supp. 2d 422 (E.D.N.Y. 2004) .............................................................. 18, 19

*Warner v. Tinder, Inc.*,

    No. 15-cv-23790, 2018 U.S. Dist. LEXIS 894 (S.D. Fla. Jan. 18, 2018)........................... 15, 24

*Wolo Mfg. Corp. v. ABC Corp.*,
   349 F. Supp. 3d 176 (E.D.N.Y. 2018) ...................................................... 19

*Woods v. Bos. Sci. Corp.*,
   No. 06 Civ. 5380, 2006 U.S. Dist. LEXIS 96050 (S.D.N.Y. Nov. 1, 2006) ........................... 14

*Young v. Wells Fargo & Co.*,
   671 F. Supp. 2d 1006 (S.D. Iowa 2009) ................................................. 24

## Statutes

Cal. Bus. & Prof. Code § 17200 ................................................................ 16

Cal. Bus. & Prof. Code § 17602 ................................................................ 16

Fla. Stat. §§ 501.201 et seq. ..................................................................... 24

N.Y. Gen. Bus. Law § 349 ................................................................ passim

N.Y. Gen. Oblig. Law § 5-903 ............................................................. passim

## Rules

Fed. R. Civ. P. 12(b) ........................................................................ passim

Fed. R. Civ. P. 12(d) ............................................................................ 22

Fed. R. Evid. 901 ................................................................................ 21

Plaintiffs Trustpilot Damages LLC as assignee ("TDL") and Tumbaco Inc. d/b/a Quasar Expeditions ("Quasar"), individually and on behalf of the class of all others similarly situated (together, "Plaintiffs"), respectfully submit this memorandum of law in opposition to Defendant Trustpilot Inc.'s Rule 12 motion to dismiss.[1]

Trustpilot is an internet company that aggregates consumer reviews of businesses.[2] Anyone can post a review on its highly popular "Trustpilot.com" site for free—and Trustpilot says all reviews there are trustworthy, because it polices fake content.  To make money, Trustpilot sells "subscriptions" to businesses, such as Plaintiffs here, that have been or might be reviewed on Trustpilot.com.  Most are small businesses with tight budgets.  In return for a non-refundable annual fee, Trustpilot was supposed to help Plaintiffs and the other members of the Class analyze and aggregate consumer data and reviews, to improve online visibility—for example, enhanced prominence in Google search results.

On March 22, 2019, *The Times* in London reported that a lengthy investigation by its reporters uncovered that Trustpilot had allowed a select group of businesses to manipulate their reviews on Trustpilot.com.  Similar exposés followed in the coming months.  Internet companies that had partnered with Trustpilot cut ties, leaving Trustpilot unable to provide the subscription benefits that subscribers valued.  Most notably, Google prevented Trustpilot from providing subscribers enhanced prominence in search results.

---

[1]  The motion and memorandum of law in support ("Def. Mot.") are at ECF Nos. 25–26.  The declaration in support by in-house counsel is at ECF No. 27.  "Trustpilot" as used herein collectively refers to Defendant Trustpilot Inc. and Non-Parties Trustpilot A/S and Trustpilot Group plc.

[2]  Like Yelp or Tripadvisor, Trustpilot posts ratings and reviews from prior customers of those businesses.

Trustpilot faced a wave of cancellations.  It had to find a way to get unwilling subscribers to renew for the next year without realizing what was happening.  Trustpilot knew that many internet companies use an auto-renewal procedure with their subscribers.  However, the law does not permit subscriptions to be automatically renewed without clear notice before of the renewal. To get around its auto-renewal obligations, Trustpilot renewed subscribers by pretending to notify them of the renewal, but without actually doing so.

Trustpilot did this by using a shadow web domain it owns—Trustpilot.net—to send auto-renewal emails as notice.  Unlike Trustpilot.com, Trustpilot.net hosts no website and is unknown to the world.[3]  This domain (the "Shadow Domain") was designed such that its emails are marked as spam by programs like Outlook, etc., and sent to subscribers' junk folders instead of the inbox, never to be seen.  No Trustpilot subscriber would recognize an email from "@trustpilot.net"— even if their email application did not block it as junk immediately, which most did.

Trustpilot acknowledges that it used the Trustpilot.net Shadow Domain to send subscribers emails automatically renewing them for another year (and at a higher rate!).  To justify this, Trustpilot cites a number of unauthenticated documents that it improperly submits in support of its Rule 12 motion, arguing language in these would have put subscribers on notice of its auto-renewal scheme.  Yet, Trustpilot concedes that the auto-renewal language in their own documents specifically contemplates the use of the Trustpilot.com domain as the means of the parties' communication concerning auto-renewals.  Trustpilot provides no rationale for why it designed, created, paid for, and used an internet domain other than its standard Trustpilot.com.

---

[3]  Subscribers had always received emails from the primary Trustpilot domain, "Trustpilot.com," which is Trustpilot's highly visible public face.  Trustpilot uses Trustpilot.com for nearly every email it sends, from addresses ending in "@trustpilot.com."

Trustpilot subscribers did not realize they had been charged for another year until it was too late to cancel and Trustpilot had locked them in for yet another year.  If they did try to cancel, Trustpilot wrongly claimed they had been automatically renewed and could not get out of the subscription.  Trustpilot now bizarrely asserts that subscribers could have been auto-renewed without notification.  According to Trustpilot, it used the Shadow Domain for no reason at all. This makes no sense.  Trustpilot used the Shadow Domain because it knew notice was necessary for auto-renewal, under its contract and pursuant to law.  Plaintiffs shared that understanding and were surprised to see that Trustpilot had charged their credit cards for another year, even though they had not agreed to renewal and had not received notice of auto-renewal.

Courts in New York and throughout the country have consistently found that auto-renewing through false notice does not form a contract.  Courts disfavor auto-renewal processes without conspicuous notification, and have held companies liable for less egregious auto-renewal misconduct than Trustpilot's here.  This Court should dismiss Trustpilot's motion.

## I.   STANDARDS

### A.  Standards of Review

#### 1.  *Plaintiffs Are Afforded All Favorable Inferences In Opposing Rule 12 Motions*

When assessing Rule 12(b)(6) motions the Court must "accept all factual allegations in the complaint as true, and draw all reasonable inferences in the plaintiff's favor."  *Vangorden v. Second Round, Ltd. P'ship*, 897 F.3d 433, 436 (2d Cir. 2018) (quotation omitted).  A complaint states valid causes of action "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).  Plaintiffs need only "raise a reasonable expectation that discovery will reveal evidence" supporting their claims.  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 556 (2007).

In deciding the Rule 12(b)(6) motions, this Court "must consider only the complaint, exhibits attached to the complaint, matters of the public record, as well as undisputedly authentic documents . . . <u>explicitly relied</u> upon in the complaint." *Angelo v. Fid. & Guar. Life Ins. Co.*, No. 18-cv-3224, 2019 U.S. Dist. LEXIS 12251, at *3 (D.N.J. Jan. 25, 2019) (quotation omitted) (emphasis original).

### 2. *Defendant Cannot Rely On Unauthenticated, Extrinsic Documents*

Where, as here, the defendant submits in support of its Rule 12(b)(6) motion any exhibits, these documents must be (1) explicitly referenced in the complaint, and (2) authenticated evidentiarily as being what the defendant purports them to be.  Even then, crucially, they must be (3) interpreted in the light most favorable to the plaintiff.  *Angelo*, 2019 U.S. Dist. LEXIS 12251, at *8–9; *Miller v. Metro. Life Ins. Co.*, No. 17 Civ. 7284, 2018 U.S. Dist. LEXIS 195046, at *16–17 & n.7 (S.D.N.Y. Nov. 15, 2018) (Torres, J.) (refusing to consider exhibits submitted by defendant in support of motion to dismiss plaintiff-insured's breach of contract and other claims).

Defendant's Rule 12 motion presents dozens of pages of cherry-picked documents without authentication of any kind (the "Unauthenticated Exhibits").  Should the Court take any notice of the unauthenticated exhibits that Trustpilot submits here, their contents must be viewed in the light least favorable to Defendant—as to any potential ambiguities reflected in them.  *Angelo*, 2019 U.S. Dist. LEXIS 12251, at *8–9 (construing in plaintiff's favor potential ambiguities in the exhibit submitted by insurer-defendant as the policy contract in support of its Rule 12 motion).

## B. Legal Standards

### 1. *Automatic Renewal Requirements Under State Law*

State law imposes strict requirements on how agreements like Trustpilot's subscriptions may be automatically renewed.   Namely, New York prohibits auto-renewal of year-long

subscriptions like Trustpilot's unless the company provides the customer "written notice, served personally or by certified mail, calling the attention of that [customer] to the existence of such provision in the contract." N.Y. Gen. Oblig. Law § 5-903(2) ("GOL").

### 2. Breaches of Contract and Implied Covenants

To state a claim for breach of contract, a plaintiff must plead the existence of a contract between himself and the defendant; (2) performance of the plaintiff's obligations under the contract; (3) breach of the contract by that defendant; and (4) damages to the plaintiff caused by that defendant's breach. *E.g.*, *Eternity Global Master Fund Ltd. v. Morgan Guaranty Trust Co. of New York*, 375 F.3d 168, 177 (2d Cir. 2004).

The implied covenants of good faith and fair dealing are recognized in every contract. Encompassed within the implied obligation to exercise good faith are "any promises which a reasonable person in the position of the [consumer] would be justified in understanding were included [and, w]here the contract contemplates the exercise of discretion [by the business], this pledge includes a promise not to act arbitrarily or irrationally in exercising that discretion [against the consumer]." *Hoover v. HSBC Mortg. Corp. (USA)*, 9 F. Supp. 3d 223, 248–49 (N.D.N.Y. 2014) (D'Agostino, J.) (quotation omitted); *see also Dean v. United of Omaha Life Ins. Co.*, No. CV 05-6067-GHK (FMOx), 2007 U.S. Dist. LEXIS 99294, at *36–37 (C.D. Cal. Aug. 27, 2007) (confirming breach-of-covenants claim where contract did not disclose that consumers would later be subjected to inflated rates).

### 3. State Consumer Protection Law

The law of all states protects consumers like Plaintiffs against schemes like Trustpilot's. New York law prohibits "[d]eceptive acts or practices in the conduct of any business, trade or commerce or in the furnishing of any service in th[e] state." N.Y. Gen. Bus. Law § 349(a)

("GBL").  To state a claim for a GBL violation, "a plaintiff must allege (1) that the defendant's acts were consumer oriented, (2) that the acts or practices are deceptive or misleading in a material way, and (3) that the plaintiff has been injured as a result."  *Michelo v. Nat'l Collegiate Student Loan Tr. 2007-2*, 419 F. Supp. 3d 668, 701 (S.D.N.Y. 2019) (Gardephe, J.).

## II.    BACKGROUND

### A.  Trustpilot Lured Customers Based On Its Reputation For Integrity

Trustpilot's "Trustpilot.com" Website, founded in Denmark in 2007, posts consumer reviews of businesses.  The Website is one of the most popular sites in the world.  Any user can review any business, free of charge.  A user-policed flagging system purportedly ensures that inauthentic reviews are quickly identified and scrutinized, and Trustpilot claims it also actively looks for these.  (Compl. ¶¶ 1–2).[4]  Trustpilot sells subscriptions to businesses, most of these being, like Plaintiffs, small and with limited budgets (the "Customers").  These pricy annual subscriptions (the "Subscriptions") were said to provide Customers services that would help them improve the extent and favorability of their online visibility.  Among other things, Customers were to get access to consumer data and other purported benefits that Trustpilot claims provide (1) consumer-insight data generated by the Website's activity, and (2) limited means of controlling how consumer reviews about them are displayed online.  Trustpilot also said it would help Customers manage their intellectual property pertaining to their online reputation—for example, how their business descriptions, rankings, and the like appeared in Google searches.  (*Id.* ¶¶ 3, 45).

Yet big profits were elusive.  In particular, Trustpilot struggled to break into the crucial U.S. market, where it barely made a dent compared to its strong revenue growth in Europe and the

---

[4]  References herein to "Compl. ¶ __" are to the Amended Class Action Complaint (ECF No. 24). Unless otherwise stated, all capitalized terms herein have the same meaning as defined therein.

United Kingdom.  As its 10-year anniversary approached, Trustpilot's initial funding from investors—most prominently, funds controlled by the Danish government—was running out, while its poor sales in the U.S. meant venture capitalists and the like would be skeptical of further capital infusions.  In addition, Trustpilot could not raise money the most reliable way, by listing publicly, because the markets are uninterested in European startups unless they are "unicorns"— capable of a $1 billion valuation at initial public offering—and Trustpilot's struggles in the U.S. meant it did not earn enough to justify that high a valuation.  Trustpilot resolved to shore up its U.S. sales, no matter what, and finally go public.  (*Id.* ¶¶ 26–32).

### B.  Trustpilot's Integrity Scandals Destroy The Subscriptions' Value

Critics for years wondered whether Trustpilot allowed certain businesses to game the review system.  In 2018 and 2019, investigations by the BBC and *The Times* (London) confirmed that Trustpilot has an integrity problem.  According to these investigations, preferred subscribers were able to have negative reviews blocked or suppressed.  Meanwhile, smaller businesses solicited by Trustpilot got no preferential treatment for their subscriptions, which cost them a much greater share of their tight budgets.  The preferential treatment consisted of (1) approving removal of negative reviews that had been falsely "flagged" as inappropriate content, and (2) supplying bespoke assistance with ensuring prominence online and on social media.  (*Id.* ¶¶ 33–43).

These revelations would lead to blowback against Trustpilot that destroyed whatever value the Subscriptions may have held for Customers like Plaintiffs.  Namely, Google announced in late 2019 that it was taking measures to stop the contamination of fake reviews which Trustpilot had enabled, and these steps would directly impact Customers negatively.  The remediation involved blocking from Google search results the "rich snippets" of positive online feedback that Trustpilot and the Customer had gathered, and that Google had permitted to be inserted in its search results.

For most Customers, the Google "rich snippets" capability was the essential benefit of their Subscription with Trustpilot.  By favoring the select preferred subscribers, Trustpilot had killed the thing that gave the Subscriptions their value.  (*Id.* ¶¶ 44–48).

### C.  Trustpilot Uses The Shadow Domain To Send Auto-Enroll Emails

As its integrity scandals unfolded, Trustpilot decided to trap Customers into another year's Subscription, before they had the chance to exit.  To do this, Trustpilot made use of the fact that it owns two web domains—both the "Trustpilot.com" Website, and the "Trustpilot.net" Shadow Domain—and can use either to send emails.  Customers were used to seeing emails from "@trustpilot.com" addresses, from the confirmation of Subscription creation, to countless promotional offers.  Yet, when the integrity scandals began Trustpilot sent Auto-Enroll Emails from an "@trustpilot.net" address.  (*Id.* ¶¶ 49–53).  There were two ways that this ensured Customers would never see the Auto-Enroll Emails until it was too late.  First, the Shadow Domain's digital infrastructure was coded such that Email Clients like Gmail would regard the Shadow Domain as a source of junk email pursuant to required international protocols like Domain-based Message Authentication, Reporting, and Conformance ("DMARC").  The Auto-Enroll Emails were thus designed to go straight to junk.  Second, even if a Customer somehow timely did see it, they would have dismissed it as junk, having been conditioned to believe Trustpilot personnel used "@trustpilot.com" addresses.  Indeed, Customers were emailed from such recognized addresses soon after Trustpilot sent the Auto-Enroll Emails from the Shadow Domain.  (*Id.* ¶¶ 49–53, 60–73).

None of this had been disclosed to Customers when they first signed up for Subscriptions.  In addition, even if Customers did timely see and read the Auto-Enroll Emails, these messages would not have notified Customers what was about to happen.  Auto-Enroll Emails summarily

stated the Customer's "plan will renew," without further detail about when, under what terms, and subject to what cancellation protocols, renewal would occur.  The Auto-Enroll Email did not assert that the Customer's existing Subscription for the preceding year permitted Trustpilot to automatically renew for another year.  (*Id.* ¶¶ 49–53, 60–73, 85–90).   After so ensnaring Customers, Trustpilot immediately began charging them for a new year.  If they tried to quit, Trustpilot refused and threatened legal action.  Aside from this, they essentially could not quit without Trustpilot's cooperation, as this risks Trustpilot's reducing online visibility of positive reviews. (*Id.* ¶¶ 54–56).

## III.   ARGUMENT

### A.  New York Law Precludes Trustpilot's Auto-Renewal Scheme

New York law precludes Trustpilot from enforcing renewals of year-long agreements without providing customers legally sufficient notice.[5]  *See* GOL § 5-903.  Trustpilot's auto-renewal of Plaintiffs' Subscriptions without sufficient notice thus amounts to numerous violations, including breach of contract.  Collecting money on an invalidly-renewed service agreement constitutes breach.  *Ambush Alarm & Elecs., Inc. v. 606 Second Ave. Rest. Corp.*, No. 16-2593, 2018 N.Y. Misc. LEXIS 1196, at *3–4 (2d Dep't Apr. 5, 2018).

In *Ambush Alarm*, the customer alleged that his servicer had unlawfully auto-renewed him for a new subscription without providing the notice required by the GOL.  He claimed this meant the new subscription could not be enforced to make him keep paying for the service.  The servicer responded that the agreement's written terms expressly permitted it to auto-renew, and that the customer was well aware of this.  The Second Department rejected the servicer's logic, which

---

[5]  The parties agree that New York law concerning formation of contracts controls here.  (Def. Mot., at 19).

undermines the "purpose of the notice provision[—]to protect service recipients from the harm of unintended automatic renewals of contracts for consecutive periods." *Id.* (quotation omitted).  The servicer was in breach, and could not keep the payments imposed after auto-renewal.  *Id.*

### B.  Trustpilot Breached Its Contracts And The Implied Covenants

#### 1.  *Plaintiffs' Breach-of-Contract Claims Are Valid*

Plaintiffs plead valid breach-of-contract claims, because the parties' initial contract did not permit Trustpilot to charge Plaintiffs money in order to auto-renew Subscriptions beyond the initial contract's twelve-month period.  *Lussoro v. Ocean Fin. Fed. Credit Union*, 456 F. Supp. 3d 474, 483–86 (E.D.N.Y. 2020) (Chen, J.) (defendant breached agreement with customers by imposing charges not expressly delineated in terms of use); *see Nick's Garage, Inc. v. Progressive Cas. Ins. Co.*, 875 F.3d 107, 118 (2d Cir. 2017) (breach where defendant unilaterally construed terms of use as permitting withholding of benefits).

In addition, the increased charges by Trustpilot in the auto-renewal year were not contemplated by the parties.  *Labajo v. Best Buy Stores, L.P.*, 478 F. Supp. 2d 523, 529–30 (S.D.N.Y. 2007) (Chin, J.) (breach where consumer "did not agree to the undisclosed charges when she entered into the contract, and defendants[] impos[ed] those charges without prior disclosure"); *see Dean v. United of Omaha Life Ins. Co.*, No. CV 05-6067-GHK (FMOx), 2007 U.S. Dist. LEXIS 99294, at *19–21 (C.D. Cal. Aug. 27, 2007) (confirming breach claim where contract did not disclose that consumers would later be subjected to inflated rates).

Importantly, the Court must construe in Plaintiffs' favor any ambiguity in the agreement language upon which Trustpilot relies.  *Lussoro*, 456 F. Supp. 3d at 484–85 ("[T]o the extent this language [cited by defendant] suggests that authorization and settlement of a debit card transaction

10

do not occur at the same time, the language fails to provide any clarity regarding at what point [d]efendant may impose an overdraft fee.").

Here, Trustpilot signed services agreements with Plaintiffs without ever disclosing that they would be auto-renewed without notice, and at higher rates.  Trustpilot then did just this, compounding its violation by doing so without alerting customers of impending auto-renewal as required by GOL § 5-903.  Trustpilot enforced these invalid renewals, requiring customers to keep paying on the false assertion they were contractually bound to do so.  *See* Part II.C, *supra.*  These actions constitute breach.  *E.g.*, *Ambush Alarm & Elecs.*, 2018 N.Y. Misc. LEXIS 1196, at *4.

Trustpilot argues that its Unauthenticated Exhibits prove that it cannot be liable for its breach contract of GOL § 5-903's auto-renewal notice requirement.  (Def. Mot., at 10–11).  Even if the Court could consider the Unauthenticated Exhibits,[6] Trustpilot's failure to form an auto-renewal contract by providing GOL § 5-903 notice is not supported by these documents, which make no mention of waiver of GOL § 5-903 notice.  Trustpilot cannot excuse the breach it committed in violating the GOL, by arguing that Plaintiffs acceded to a negative option auto-renewal.  *Id.* (Second Department rejects GOL-violating servicer's argument that customer must have known auto-renewal would occur because this was stated in the service agreement).

Indeed, even according to Trustpilot's own version of the facts, its disclosure of auto-renewal would have been ambiguous and so not authorizing it to take the actions it wished.

---

[6]  As an initial matter, Plaintiffs object to this argument on the grounds that it is reliant on the Unauthenticated Exhibits, which cannot be considered due to their lack of authentication.  *See* Parts I.A.2, *supra*, & -III.D, *infra*. Plaintiffs nevertheless address the substance of Trustpilot's argument.

According to Trustpilot, this purported disclosure stated that the "Trustpilot.com" Domain would be used for auto-renewal, when in fact Trustpilot used the Shadow Domain.  (Def. Mot., at 6).[7]

All of the authority Trustpilot relies on concerning breach of contract is inapposite.  (Def. Mot., at 11–12).  In *Mazzola v. Roomster Corp.*, 849 F. Supp. 2d 395, 407–09 (S.D.N.Y. 2012) (Koeltl, J.), the plaintiff could not prove breach because she acknowledged in her complaint that the auto-renewal procedure was disclosed and fully explained in the terms of use.  *Id.* at 402.  Even there, the court approved her breach claim for the defendant's refusal to permit her to cancel.  *Id.* Here, Trustpilot not only failed to disclose its auto-enroll scheme at formation—it <u>also</u> prevented Plaintiffs from canceling by concealing the auto-renewal until too late.  *See* Part II.C, *supra*.[8]

In *Cafferty Clobes Meriwether & Sprengel, LLP v. XO Communs. Servs.*, 190 F. Supp. 3d 765, 770 (N.D. Ill. 2016), the defendant mailed the plaintiff a large-text, two-page reminder of the agreement's impending auto-renewal as an attachment to each monthly bill—i.e., gave the consumer notice in writing every 30 days.  In contrast, Trustpilot's Shadow Domain emails were calculated <u>not</u> to be read by subscribers.  *See* Part II.C, *supra*.

---

[7]  Again, Trustpilot cannot escape breach liability by selectively reading its own Exhibits so as to resolve any ambiguities in its favor; Plaintiffs are due all beneficial inferences.  *Lussoro*, 456 F. Supp. 3d at 484–85.

[8]  Trustpilot seeks to distinguish *Mazzola*, on the basis that the plaintiff there demanded cancellation prior to auto-renewal.  (Def. Mot., at 11 n.2).  This distinction is irrelevant.  The *Mazzola* court found the defendant liable for imposing subscriptions that were effectively non-cancellable, given the auto-renewal combined with refusal to cancel.  *See* 849 F. Supp. 2d at 401, 407–08 (imposing liability for breach, and violations of California protective statute).  The *Mazzola* court was not concerned with <u>when</u> the cancellation had been requested—what mattered was that the combination of auto-renewal and refusal to cancel meant the consumer could not extricate herself from the agreement, no matter what she did.  *See id.*  Trustpilot used the same combination to ensure Plaintiffs could not get out of Subscriptions.  *See* Part II.A & C, *supra*.

2.   *Plaintiffs' Claims of Breach of Implied Covenants Are Valid*

The covenants "encompass any promises which a reasonable person in the position of the promisee would be justified in understanding were included" in the agreement.  *511 W. 232nd Owners Corp. v. Jennifer Realty Co.*, 98 N.Y.2d 144, 153 (2002) (quotation omitted); *see, e.g.*, *JPMorgan Chase Bank, N.A. v. IDW Grp., LLC*, No. 08 Civ. 9116, 2009 U.S. Dist. LEXIS 9207, at *20–25 (S.D.N.Y. Feb. 9, 2009) (Gardephe, J.) (confirming breach-of-covenants claim where defendant failed to disclose information relevant to contract's terms, and so "subvert[ed] the contract's purpose without violating its express terms").

Courts reject Trustpilot's argument that its duty to comply with the implied covenants was negated by the contract's alleged unfettered discretion to auto-renew in any manner and at any rate.  (Def. Mot., at 12).[9]  A contract cannot waive a party's duty to not act in "bad faith."  *Hoover*, 9 F. Supp. 3d at 248–50 (listing cases) (approving breach-of-covenants claims where plaintiffs were deceived into purchasing service less valuable than promised).  As in *Hoover*, Plaintiffs' renewed Subscriptions had far less value than the parties contemplated during the initial contract, because of Trustpilot's improper review-changing scheme, which damaged Trustpilot's reputation for impartiality.  Knowing that the value of the auto-renewal was no longer the value contemplated by the parties, Trustpilot endeavored to conceal the auto-renewal.  *See* Part II.A–C, *supra*.

Plaintiffs' breach-of-covenants claims allege that Trustpilot's auto-renewals involved a series of bad-faith actions that were neither authorized by the Subscriptions' terms, nor consistent with what Customers wanted out of the Subscription—help boosting their online visibility.  These bad-faith actions included coding the Shadow Domain's infrastructure in contravention of

---

[9]   Plaintiffs initially object to this argument on the grounds it relies on the Unauthenticated Exhibits, which cannot be considered due to lack of authentication.  *See* Parts I.A.2, *supra*, & -III.D, *infra*.

DMARC protocol, such that the Auto-Enroll emails went to junk.  Another example: Trustpilot failed to even include cancellation information in the Auto-Enroll Email, such that any customer who <u>might</u> have seen it in the junk folder would not know how to <u>stop</u> the auto-renewal.  *See* Part II.C, *supra*.  Even if Plaintiffs had signed an agreement generally disclosing auto-renewal—and again, there is no record here they did—they still would have expected to be informed of actions by Trustpilot that affected their ability to control auto-renewal.  *See JPMorgan Chase Bank*, 2009 U.S. Dist. LEXIS 9207, at *20–25.

Trustpilot is incorrect that Plaintiffs' breach-of-covenants claims are defective because (Trustpilot says) they "are duplicative of" the breach-of-contract claims.  (Def. Mot., at 13).  This logic impermissibly "conflate[s] the issue of whether" the contract generally grants one party a particular right, and whether that party can exploit this "in the manner it has attempted."  *Woods v. Bos. Sci. Corp.*, No. 06 Civ. 5380, 2006 U.S. Dist. LEXIS 96050, at *68–70 (S.D.N.Y. Nov. 1, 2006) (Katz, Mag. J.) (affirming simultaneous breach-of-contract and breach of covenant claims).

Trustpilot argues that Plaintiffs' breach-of-covenant claims and breach-of-contract claims are so reliant upon the same facts that they cannot co-exist.  (Def. Mot., at 13).  Trustpilot relies on *Underdog Trucking, LLC v. Verizon Servs. Corp.*, No. 09 Civ. 8918, 2010 U.S. Dist. LEXIS 72642, at *17–18 & n.6 (S.D.N.Y. July 20, 2010) (Cote, J.) (cited by Def. Mot., at 13), which simply held a plaintiff may not plead breach of covenants by incorporating all the facts from the breach-of-contract claim and then vaguely referencing "other facts to be proven at trial."  *Id.*[10]

---

[10]  Because of this pleading deficiency—which does not exist here—the *Underdog Trucking* court did not compare and contrast two sets of facts, one underpinning breach-of-covenant claims, and the other, those underpinning simultaneously pleaded breach-of-contract claims.  *Underdog Trucking* certainly cannot stand for the premise that a court must engage in such comparison, let alone in a manner that leaves a plaintiff without valid claims.  *See id.*; *cf. id.* at *24–25 (emphasizing that, though breach-of-covenants claims were dismissed, plaintiff still had valid breach-of-contract claims).

Regardless, Plaintiffs' breach-of-covenant claims are independently premised on facts about Trustpilot's actions in creating and maintaining the Shadow Domain so as to cover up imposition of auto-renewal.  Meanwhile, the breach-of-contract claims separately focus on the fact that the underlying agreement did not authorize Trustpilot to auto-renew, or renew at higher rates. (*See* Compl. ¶¶ 85–90).  These two sets of claims and facts are distinctly pleaded, and each independently triggers liability.  *See JPMorgan Chase Bank*, 2009 U.S. Dist. LEXIS 9207, at *20–25 (refusing to dismiss claims as duplicative).

## C.  Trustpilot Violated Statutory Protective Law

### 1.  *Plaintiffs' Statutory Claims Are Valid*

Trustpilot violated GBL § 349 and similar protective law by automatically renewing customers' subscriptions without proper notice, then collecting money on the hidden renewal. *Ovitz v. Bloomberg, L.P.*, No. 603692/08, 2009 N.Y. Misc. LEXIS 6239, at *13–15 (Sup. Ct. N.Y. Cnty. Oct. 7, 2009) (confirming GBL and GOL liability);[11] *see also, e.g.*, *Mazzola*, 849 F. Supp. 2d at 407–09 (same, under California consumer protection statute) (cited by Def. Mot., at 10–11); *Warner v. Tinder, Inc.*, No. 15-cv-23790, 2018 U.S. Dist. LEXIS 8941, at *23–28 (S.D. Fla. Jan. 18, 2018) (same, Florida).

Auto-renew schemes like Trustpilot's have been found to violate broadly worded protective law such as the GBL, regardless of the existence of a statute expressly prohibiting auto-renewal. *Arnold v. Hearst Magazine Media, Inc.*, No. 19-cv-1969, 2021 U.S. Dist. LEXIS 25706,

---

[11] *Rev'd on other grounds*, 77 A.D.3d 515 (1st Dep't 2010) & 18 N.Y.3d 753 (2012).  The appeals courts in *Ovitz* concluded the plaintiff there could not proceed on his claims for technical reasons not found here: his purchase occurred outside of New York and so he could not invoke the GBL, and the defendant allowed him to cancel without paying, so there were no damages. *See* 18 N.Y.3d at 758–59.  Here, in contrast, purchase occurred in New York, and Plaintiffs have damages because Trustpilot force them to pay post-auto-renewal, even if they tried to cancel. *See* Part II.C, *supra*.

at *20–21 (S.D. Cal. Feb. 10, 2021) (imposing liability for hidden auto-renewals, under both California's longstanding, broadly worded protective statute, and new statute specifically targeting auto-renewal).   Statutes like the GBL "prohibit[] a broader category of practices that may be deemed unfair or fraudulent even if not specifically proscribed by some other law." *Arnold*, 2021 U.S. Dist. LEXIS 25706 at *20–21 (analyzing statute with same broad language as the GBL) (quotation omitted).   While not a prerequisite to liability, the violation of an expressly proscriptive statute only confirms that liability must be imposed under the broader provision.  *See id.*; *see also*, *Nick's Garage, Inc.*, 875 F.3d at 127 ("[Plaintiff's claim] that [Defendant] engaged in inherently deceptive conduct relating to [auto-renewal] supports a viable claim of violation of GBL § 349, regardless of whether the conduct also violated [a more specific statutory provision].").

Under New York law, the GOL augments the GBL by specifically prohibiting auto-renewal of subscriptions like Trustpilot's, unless the company provides the customer clear and conspicuous notice of the renewal, and well in advance.  *See* GOL § 5-903.  Other states similarly use targeted and broad provisions together to ensure liability for conduct like Trustpilot's.  *See, e.g.*, Cal. Bus. & Prof. Code § 17200 (broad prohibition on deceptive business practices); *id.* § 17602(a) (specific requirement for clear, conspicuous notice of auto-renewal).  Liability may be imposed under either or both.  *See Arnold*, 2021 U.S. Dist. LEXIS 25706, at *19–22; *King v. Bumble Trading, Inc.*, 393 F. Supp. 3d 856, 869–70 (N.D. Cal. 2019) (same) (defendant failed to disclose auto-renewal in detail or send prominent reminder email).

Trustpilot argues that its Unauthenticated Exhibits prove it cannot be held liable under GOL § 5-903 and GBL § 349.  According to Trustpilot, certain Unauthenticated Exhibits show that its auto-renew scheme was fully disclosed to Plaintiffs when their subscriptions began, and

these statutes cannot apply when the company so discloses. (Def. Mot., at 16–17).[12]  However, Trustpilot cannot identify in its Unauthenticated Exhibits any document that would have (1) disclosed to Plaintiffs when Subscriptions began that these would be auto-renewed via the Shadow Domain,[13] or (2) reminded Plaintiffs of auto-renewal shortly beforehand, in the clear and conspicuous manner required. *Compare* Def. Mot., at 16–17, *with, e.g.*, GOL § 5-903.  Indeed, Trustpilot fails to explain why it designed, created, and paid for its Shadow Domain.

The two cases that Trustpilot relies on confirm that companies are statutorily liable for auto-renewing without due notice.  In *Asimov v. Trident Media Group, LLC*, 999 N.Y.S.2d 796 (Sup. Ct. N.Y. Cnty. 2014), the estate of a best-selling author contested an auto-renewal provision that the estate had specifically bargained for in the contract.  *See id.* at 796 (cited by Def. Mem. at 16–17).  Unremarkably, the court interpreted the contract against the estate after its participation in the drafting.  *See Asimov*, 999 N.Y.S.2d at 796.  This is a far cry from a boilerplate consumer contract that Trustpilot drafted itself.  (Def. Mem. at 6, 16–17).

Next, *Ludl Elec. Prods. v. Wells Fargo Fin. Leasing, Inc.*, 6 A.D.3d 397 (2d Dep't 2004) (cited by Def. Mot., at 15–17) is inapposite for the same reason as *Asimov*.  Ludl, a manufacturer of business equipment, also negotiated to have an auto-renewal provision added to its contract. The court was thus unimpressed by Ludl's argument that its auto-renewal provisions was deceptive in violation of the GBL, after insisting on the provision itself.  *See Ludl*, 6 A.D.3d at 397–98.  In contrast, Plaintiffs here do not dispute businesses' right to employ auto-renewal generally—

---

[12]  Plaintiffs initially object to this argument on the grounds it relies on the Unauthenticated Exhibits, which cannot be considered due to lack of authentication.  *See* Parts I.A.2, *supra*, & -III.D, *infra*.

[13]  Trustpilot concedes that the auto-renewal language in their own Unauthenticated Exhibits specifically contemplates the use of the "Trustpilot.com" domain as the means of the parties' communication concerning auto-renewals.  (Def. Mot., at 6).

indeed, state law recognizes this general right.  *See* Part I.B.1, *supra*; *see also* GOL § 5-903.  What Plaintiffs contest is Trustpilot's abuse of this right, by imposing auto-renewal unilaterally and without the requisite clarity, conspicuity, and notice.  Trustpilot is liable for this.  *E.g.*, *Arnold*, 2021 U.S. Dist. LEXIS 25706, at *19–22 (statutory liability for hidden auto-renewal scheme); *King*, 393 F. Supp. 3d at 870 (auto-renewing defendant statutorily liable, even though it emailed customers reminder shortly beforehand, as the emails were not prominent enough).

## 2.   *Trustpilot's Statutory Violations Are Not Excused By Any Technicality*

Trustpilot asserts that two purported loopholes in the applicable statutes somehow excuse its liability.  Even if these did exist (which they do not), they would not help Trustpilot.

### a)   Trustpilot's Scheme Is Consumer-Oriented

Trustpilot incorrectly argues that deceptions by one business against another are categorically not covered by the GBL, which is limited to "consumer-oriented" bad acts.  (Def. Mot., at 17–18).  This argument fails because "[s]mall business owners," like Plaintiffs, "as purchasers and potential purchasers of [defendant's service], qualify as 'consumers' within the meaning of the statute."  *Verizon Directories Corp. v. Yellow Book USA, Inc.*, 338 F. Supp. 2d 422, 428 (E.D.N.Y. 2004) (Weinstein, J.).[14]

Further, the GBL applies because the purpose of the interactions between Plaintiffs and Trustpilot was to influence consumer activity.[15]  Influence over consumer activity is the very

---

[14] *See, e.g.*, *Oswego Laborers' Local 214 Pension Fund v. Marine Midland Bank, N.A.*, 85 N.Y.2d 20, 25 (1995) (pension fund sufficiently alleged consumer-oriented conduct against a bank where the bank used standard documents presented to customers upon the opening of accounts and the account openings were not unique to these two parties).

[15] For example, on Trustpilot's landing web page for subscribers, it says: "Learn why over 400,000 businesses are using customer reviews to drive growth with Trustpilot.  Trustpilot is the leading global review platform helping businesses collect customer reviews and leverage them to boost their traffic, sales, and revenue." (available at: https://marketing.trustpilot.com/requestademo-learn-why-businesses-are-using-trustpilot, last visited April 22, 2021)

reason small businesses pay for Trustpilot's services.   As Trustpilot admits on its website, subscribers use Trustpilot's product to "collect customer reviews and leverage them to boost their traffic, sales, and revenue"; this is decidedly consumer-oriented.   *See Verizon Directories*, 338 F. Supp. 2d at 428–29 (dispute between directories companies fell under GBL, as the defendant's deceptive statements "may have had an impact on at least a few businesses misled as to the value of [the listings] they purchased, as well as on some members of the general public probably denied in at least some cases a more extensive listing of businesses.").[16]   By imposing auto-renew on regular customers like Plaintiffs, while helping a few wealthy customers game their reviews, Trustpilot simultaneously deceived small businesses and individual consumers.   *See* Part II.A–C, *supra*.   Such actions are consumer-oriented for GBL purposes.   *See* 338 F. Supp. 2d at 428.[17]

     b)   <u>Trustpilot Provides Services For Property</u>

Trustpilot argues that it does not render services to or for "real or personal property," and so cannot be held liable under GOL § 5-903.   (Def. Mot., at 18–19).   This argument fails, because it relies on Trustpilot's misinterpretation of the definitions of "service" and "property" under the law.   Courts take an "expansive approach" "in interpreting § 5-903," "generously read[ing its provisions] in order that their scope will engage the variegated evil the statute was intended to

---

[16]  *See also Wolo Mfg. Corp. v. ABC Corp.*, 349 F. Supp. 3d 176, 210 (E.D.N.Y. 2018) (Feuerstein, J.) (validating consumer goods manufacturer's GBL claim against competitor for publicly making deceptive comparisons).

[17]  Trustpilot unavailingly cites to cases that are irrelevant here because there was no potential for impact on the general consuming public.   (Def. Mot., at 17).   In *Cruz v. NYNEX Info. Resources*, 263 A.D.2d 285 (1st Dep't 2000), the plaintiffs claimed a directory company misled businesses with listings as to when new directories would be distributed to the public—but, unlike here, there was no claim such deceptions impacted the <u>content</u> of what the general public ultimately read.   *Id.* at 287, 290.   Likewise, in *Radiology & Imaging Specialists of Lakeland, P.A. v. FUJIFILM Med. Sys.,* 2021 U.S. Dist. LEXIS 8366 (S.D.N.Y. Jan. 15, 2021) (Hellerstein, J.), radiology groups accused an equipment seller of providing a product they did not believe was efficient as promised—but there was no claim this affected patients or their care.   *Id.* at *1–2, 11–12.

meet." *Carbo Indus. v. Coastal Ref. & Mktg.*, 154 F. App'x 218, 219–20 (2d Cir. 2005) (quotation omitted). Only exempted are "consulting contracts" wherein two sophisticated parties on equal financial footing negotiate a bespoke contract limited to advice and nothing else. *Id.* (rejecting argument that agreement to provide small business with services like "inventory verification" "fall[s] within the limited exception" under the GOL whereby "consulting contracts" may be auto-renewed without notice).

Transacting in intellectual property—like customer data and reviews—is within the scope of § 5-903. *Healthcare I.Q., LLC v. Tsai Chung Chao*, 118 A.D.3d 98, 103–105 (1st Dep't 2014) (applying § 5-903 to healthcare services provider's agreement with doctor, as provider serviced "property" in form of electronic data concerning both the practice group as a business, and patients' personal information).[18] Here, Trustpilot was engaged to service intellectual property belonging to Plaintiffs and/or countless internet users—namely, data on online activities of (1) Plaintiffs and (2) their own customers (or potential ones). *See* Part II.A–B, *supra*. As such, § 5-903 applies to the service Trustpilot was paid to perform. *See* 154 F. App'x at 219.[19]

---

[18] *See also Expo Sure USA v. Pita Lovers*, No. CV-0105108-17, 2019 N.Y. Misc. LEXIS 143, at *4–3 (Dist. Ct. Nassau Cnty. Jan. 16, 2019) (applying § 5-903 to agreement to service lists of small business's customers and email addresses).

[19] Trustpilot's lone citation on this point confirms the narrowness of the "consulting contract" exception to § 5-903 that Trustpilot relies upon. (Def. Mot., at 18–19). In *Donald Rubin, Inc. v. Schwartz*, 160 A.D.2d 53 (1st Dep't 1990), the parties were a union plan and a consulting firm specializing in benefits advice, and they had negotiated at arm's length a bespoke contract, specifically labeled as a "consulting" agreement. The consultants were expressly disallowed from directly handling plan property in connection with providing advice, because the plan's trustees were the only ones with fiduciary authority to do so. Under these exceptional circumstances, § 5-903 did not apply. *Donald Rubin, Inc.*, 160 A.D.2d at 54–58. This precedent is the exception proving the general rule that services agreements involving data and online-related assistance do fall under § 5-903. *Healthcare I.Q., LLC*, 118 A.D.3d at 104 (distinguishing *Donald Rubin*).

### D.  Defendant's Unauthenticated Exhibits Should Not Be Considered

Trustpilot submits as supporting exhibits 10 documents that were unauthenticated,[20] and not expressly relied upon in Plaintiffs' Complaint.  The law does not permit consideration of these Unauthenticated Exhibits in assessing the Rule 12 motion.  *Marc J. Elkowitz, M.D., P.C. v. UnitedHealthcare of N.Y., Inc.*, No. 17-CV-4663, 2021 U.S. Dist. LEXIS 66114, at *8 (E.D.N.Y. Mar. 31, 2021) (Irizarry, J.) (refusing to consider "voluminous" documents submitted by defendant in support of Rule 12(b)(6) motion); *accord, e.g.*, *Hsu v. Puma Biotechnology, Inc.*, 213 F. Supp. 3d 1275, 1281 (C.D. Cal. 2016) (decrying practice of "Rule 12(b)(6) motions to dismiss filed with hundreds of pages of attachments, [invalidly] authenticated through attorney declarations").

In trying to justify submitting the Unauthenticated Exhibits, Trustpilot cites to cases in which the court properly took notice of a contract document "integral" to the complaint because the pleading "relies heavily upon [the document's] terms and effect."  *Chambers v. Time Warner, Inc.*, 282 F.3d 147, 153 (2d Cir. 2002) (cited by Def. Mot., at 8).  None of the Unauthenticated Exhibits—described by Trustpilot as primarily consisting of corporate records—qualifies for such treatment.  Unlike in *Chambers*, where the complaint repeatedly invoked specific contract terms verbatim, *see id.*, Plaintiffs' pleading never references the Unauthenticated Exhibits nor relies on them.  Trustpilot is simply bootstrapping its argument by insisting the Unauthenticated Exhibits are part of the contract and all things that they say are in the contract are "referred to."  No court has applied this reasoning before.  *See* Parts I.A.2, *supra*, & -III.D, *infra*.[21]

---

[20]  Defendant's Unauthenticated Exhibits were submitted without authentication by an individual with personal knowledge of the documents.  *See* Declaration of Taylor Morgan Silverstein in Supp. Mot.  Dismiss (ECF No. 27) ("Decl.") (Trustpilot in-house counsel's declaration); *compare id.* & Exs. 1–10, *with* Fed. R. Evid. 901 (requiring authentication).

[21]  *Chambers* provides a second reason this Court must reject any Unauthenticated Exhibit, including ones identified by Trustpilot as the underlying "Agreement": "Courts have declined to

*Chambers* also makes clear that, to the extent a court considers any of the Unauthenticated Exhibits in assessing a Rule 12 motion like Trustpilot's, the court may <u>only</u> consider documents that are <u>undisputedly</u> the contract. *See* 282 F.2d at 154 (refusing defendant's proffer of documents that were labeled as contract-related business records and that were arguably incorporated by referenced in the plaintiff's complaint, because the complaint did not discuss them at length).[22]

If the Court were to consider these Unauthenticated Exhibits, the effect would be to convert Defendant's Rule 12 motion to one for summary judgment—and it would be improper to grant a converted motion without affording Plaintiffs discovery. *Marc J. Elkowitz, M.D., P.C.*, 2021 U.S. Dist. LEXIS 66114, at *9–10 (citing Fed. R. Civ. P. 12(d)). Further, even if this Court does choose to look at the Unauthenticated Exhibits, it should keep in mind that they are a cherry-picked subset of the universe of documents that will be requested in discovery. Nevertheless, the Unauthenticated Exhibits confirm that Trustpilot used deceptions to force Plaintiffs into automatically renewing, and at impermissibly higher rates.

### E.  Trustpilot's Miscellaneous Defenses All Fail

Trustpilot raises several defenses that are procedurally barred here because they are premature. Each one also fails substantively.

### 1.  *Plaintiffs Properly Plead Alternative Claims*

Trustpilot argues that Plaintiffs may not state a claim for unjust enrichment because they plead breach, and these claims are duplicative. (Def. Mot., at 14–15). However, auto-renewal

---

consider unsigned [contract] documents in ruling on motions to dismiss," 282 F.3d at 154 n.5, and the Unauthenticated Exhibits identified as an "Agreement" contain no signed contracts.

[22]  Trustpilot also asks this Court to judicially notice an Unauthenticated Exhibit described as Plaintiff TDL's incorporation certificate. (Def. Mot., at 8–9). However, judicial notice at the Rule 12 stage is generally inappropriate and should be limited to documents made part of the record by a sister court. *Holmes v. Air Line Pilots Ass'n*, 745 F. Supp. 2d 176, 194 & nn.36–37 (E.D.N.Y. 2010) (Matsumoto, J.) (judicially noticing documents from bankruptcy reorganization).

victims like Plaintiffs properly plead unjust enrichment as an alternative claim, as the dispute might not necessarily be resolved by focusing on contract law.  *Arnold*, 2021 U.S. Dist. LEXIS 25706, at *19–22 (refusing to dismiss unjust enrichment claim prior to discovery in class action over hidden auto-renewals).  Accordingly, an unjust enrichment claim may not be dismissed at the Rule 12 stage, so long as there is a chance the plaintiff's contract claims at law might fail, while equity might demand redress.  *Haraden Motorcar Corp. v. Bonarrigo*, No. 19-cv-01079, 2020 U.S. Dist. LEXIS 68666, at *28–30 (N.D.N.Y. Apr. 20, 2020) (Sannes, J.) (refusing to dismiss unjust enrichment claims under Rule 12(b)(6)).

   2.  *Plaintiffs Properly Plead Claims Under Multiple States' Law*

Trustpilot argues that this Court cannot consider any claims but those under New York law, as the Unauthenticated Exhibits show a choice-of-law clause identifying New York, and such clauses are inviolable.  (Def. Mot., at 19–21).  None of this is true.  Even if this Court were to consider the Unauthenticated Exhibits, and construe them as containing a choice-of-law clause disadvantaging Plaintiffs—neither of which this Court should do—the multistate claims here still would survive.

Trustpilot is incorrect that New York law prohibits consideration of other state law where the contract contains a comprehensively worded choice-of-law clause identifying New York.  In fact, such clauses are unenforceable to the extent they might frustrate the public policy interests of another jurisdiction whose citizens have been victimized by the defendant, along with New York-based plaintiffs.  *Medicrea USA, Inc. v. K2M Spine, Inc.*, No. 17 Civ. 8677, 2018 U.S. Dist. LEXIS 110286, at *23–27 (S.D.N.Y. Feb. 7, 2018) (Torres, J.) (refusing to enforce New York choice-of-law clause where plaintiffs from California were based there throughout the underlying interactions with New York-based company).

Because Plaintiffs are not all based in New York, this Court may not enforce any choice-of-law clause insofar as New York law might afford different protections to auto-renewal victims than other states' do. *King*, 393 F. Supp. 3d at 870 (refusing to enforce New York choice-of-law provision against nationwide victims of auto-renewal scheme) (comparing GOL § 5-903, with Cal. Bus. & Prof. Code § 17601). Further, dismissal of multistate claims is improper prior to discovery into the locations of all victims of Trustpilot's scheme—potential conflict-of-law disputes cannot be resolved absent such discovery. *Young v. Wells Fargo & Co.*, 671 F. Supp. 2d 1006, 1023-24 (S.D. Iowa 2009) ("[I]t would be premature to dismiss the [additional state] statutory claims simply because neither [named plaintiff] own mortgaged property in those jurisdictions.").

Here, there is potential for mismatch between New York law and that of other involved states. For example, Plaintiff Quasar is a Florida citizen. That state's protective law does not, for example, contain the New York GOL language about "property" that Trustpilot now uses as a basis to attack Plaintiffs' New York statutory claims. *See* Part III.C.2.b, *supra*; *compare* GOL § 5-903, *with* Fla. Stat. §§ 501.201 et seq. Though differences may be slight, the potential for even minimal disadvantage means victims of auto-renewal schemes like Trustpilot's must be permitted to plead under their own states' law to protect their rights. *King*, 393 F. Supp. 3d at 870.[23]

### 3. *Plaintiff TDL Has Standing*

Trustpilot argues Plaintiff TDL has no standing because the assignment by which it received its Assignor's claims was champertous. (Def. Mot., at 22–24). But the defense of champerty carries a high burden Trustpilot cannot meet. Nothing in the facts Trustpilot asserts

---

[23]  Trustpilot is also incorrect that the law in jurisdictions like Florida does not support Plaintiffs' theories. (Def. Mot., at 21). In fact, all jurisdictions to have examined schemes like Trustpilot's confirm liability. *E.g.*, *Warner v. Tinder, Inc.*, No. 15-cv-23790, 2018 U.S. Dist. LEXIS 8941, at *23–28 (S.D. Fla. Jan. 18, 2018) (statutory liability under Florida law for hidden auto-renewals); *see also* Part III.C.1, *supra*.

against Plaintiff TDL implicate the historical concern of litigation in bad faith.  The law generally encourages assignment of property including claims, and New York's champerty statute marks an exception "narrow [in] scope."  *Matter of Wimbledon Fund, SPC (Class TT) v. Weston Capital Partners Master Fund II, Ltd.*, 184 A.D.3d 448, 449 (1st Dep't 2020) (rejecting defendant's champerty defense).[24]  To satisfy its burden, the party claiming champerty must establish the assignee-plaintiff "acquired a thing in action in order to obtain costs[, rather than simply] in order to protect an independent right of the assignee."  *Universal Inv. Advisory SA v. Bakrie Telecom Pte., Ltd.*, 154 A.D.3d 171, 180 (1st Dep't 2017).  Thus, an assignment is not champertous where the assignee has a preexisting interest in the underlying agreement.  *Id.* (citing, *Tr. for Certificate Holders of Merrill Lynch Mortg. Inv'rs v. Love Funding Corp.*, 13 N.Y.3d 190, 195–99 (2017)).

Here, Trustpilot alleges the Assignor, a Trustpilot customer, itself incorporated TDL so as to assign claims, then sue.  (Def. Mot., at 2, 23).  These facts, even if true, do not satisfy champerty's elements: TDL is bringing a claim that its principal(s) could have brought prior to assignment.  13 N.Y.3d at 195–99.  Under Trustpilot's own telling, the same entity or individual(s) that subscribed will either prevail here or suffer the costs of litigation without compensation.  This unity of interest negates Trustpilot's champerty theory.  *Id.*[25]

---

[24]  Trustpilot presumes without basis New York's champerty statute applies here.  But Plaintiff TDL is an Iowa corporation, and that state has no champerty law.

[25]  Trustpilot relies on precedent where the assignee's principals had no preexisting interest.  *See Justinian Capital SPC v. WestLB AG*, 28 N.Y.3d 160, 164 (2016) (assignor and assignee were strangers) (cited by Def. Mot., at 22–23).  Trustpilot argues one case stands for the proposition assignments of claims between "related nonparties" are champertous.  (Def. Mot., at 23–24 (citing *BSC Assocs. v. Leidos, Inc.*, 91 F. Supp. 3d 319 (N.D.N.Y. 2015)).  That case is distinguishable, as there the assignee was not incorporated until years after the underlying events, and so could have no preexisting interest.  *BSC Assocs.*, 91 F. Supp. 3d at 322–23.  Here, Trustpilot alleges TDL was created shortly after the underlying events, while the Assignor's subscription was still active.  (Def. Mot., at 23).  Finally, Trustpilot's champerty defense is premature; it cannot be assessed until completion of discovery.  *See* 28 N.Y.3d at 166.

IV.     **CONCLUSION**

For the reasons set forth above, Trustpilot's motion must be denied.

Dated:      New York, New York
            Apr. 22, 2021

                                        Respectfully submitted,

                                        **FRANK LLP**

                                        By:    _/s/ Gregory A. Frank_
                                        Gregory A. Frank (GF0531)
                                        Marvin L. Frank (MF1436)
                                        Asher Hawkins (AH2333)
                                        305 Broadway, Suite 700
                                        New York, New York 10007
                                        Tel: (212) 682-1853
                                        Fax: (212) 682-1892
                                        gfrank@frankllp.com
                                        mfrank@frankllp.com
                                        ahawkins@frankllp.com

                                        _Attorneys for Plaintiffs and the Class_