UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| TRUSTPILOT DAMAGES LLC, et al., <br><br>         Plaintiffs, <br><br>   -against- <br><br> TRUSTPILOT, INC., <br><br>         Defendant. | 21-cv-432 (JSR) <br><br><br> <u>OPINION AND ORDER</u> |

JED S. RAKOFF, U.S.D.J.

Defendant Trustpilot, Inc. ("Trustpilot") operates trustpilot.com, a website that publishes crowd-sourced reviews of businesses. Business customers can purchase annual Trustpilot subscriptions that allow businesses to access consumer insight data and to control how reviews of the business are displayed online. Trustpilot automatically renews these subscriptions unless subscribers notify the company of their desire to cancel. Plaintiff Trustpilot Damages LLC ("TDL"), an entity formed for the purpose of this lawsuit, claims that Trustpilot "designed its system to force auto-renewals" after a spate of bad press convinced business customers that annual Trustpilot subscriptions were not worth the cost. According to TDL, Trustpilot tricked business customers into paying for annual subscriptions by sending renewal reminder emails that were likely to get caught in spam filters, because those emails came from the domain name trustpilot.net.

1

On behalf of themselves and a putative class of Trustpilot subscribers, TDL and co-plaintiff Tumbaco Inc., a Florida-based company doing business as Quasar Expeditions ("Quasar"), sue Trustpilot for breach of contract, breach of the implied covenant of good faith and fair dealing, unjust enrichment, violation of New York General Business Law § 349, and violation of similar unfair business practices statutes in other states. Before the court is Trustpilot's motion to dismiss the Amended Complaint for failure to state a claim. After careful consideration, the Court hereby grants the motion to dismiss.

FACTUAL AND PROCEDURAL BACKGROUND

I.   Factual Allegations

According to the Amended Complaint, Trustpilot, as noted, operates a website, trustpilot.com, that publishes crowd-sourced reviews of businesses. Am. Compl. at ¶ 1-2, 22. Consumers can post reviews for free. Id. at ¶ 2. Trustpilot sells business subscriptions for $2,400 a year. Id. at ¶ 36. Subscribing businesses can access consumer insight data and display "positive reviews [and] . . . 'badges' showing good ratings[] on their own websites and social media." Id. at ¶ 3, 36. Trustpilot subscriptions are governed by a subscription agreement. See id. at ¶ 86; Silverstein Decl., ECF No. 27, at Ex. 2 ("Service Subscription Agreement"). The subscriber agreement contains an

autorenewal provision: subscribers are automatically reenrolled unless they provide Trustpilot with notice of their intent to cancel their subscriptions. Am. Compl. ¶ 4.

TDL is an Iowa limited liability company with an office in New York. Id. at ¶ 17. The entity "was formed to obtain justice for Trustpilot subscribers affected by the violations described" in the Amended Complaint. Id. TDL is the assignee of the causes of action possessed by "at least one Trustpilot customer" ("Assignor"), who subscribed to Trustpilot in November 2017. Id. at ¶ 17-18. Assignor is headquartered in New York. Id. at ¶ 18. Assignor received over a hundred emails from the trustpilot.com domain, followed in October 2019 by an autorenewal email from the trustpilot.net domain. Id. at ¶ 19, 55 n.18. Because Assignor's email client routed the autorenewal email to the junk folder, Assignor did not see the email until after the subscription had already been renewed. Id. at ¶ 17-19, 55 n.18.

Quasar is a Florida company that "organizes land and sea travel experiences in South America." Id. at ¶ 20. Quasar subscribed to Trustpilot on or around March 12, 2015. Id. at ¶ 21. Quasar received over a hundred emails from the trustpilot.com domain. Id. In March 2018, when Quasar received an autorenewal notice from the trustpilot.net domain, the Outlook email program flagged the message as junk. Id. Quasar did not read the email "until it was too late to cancel." Id.

According to the Amended Complaint, the autorenewal emails "summarily stated the Customer's 'plan will renew,' without further detail about when, under what terms, and subject to what cancellation protocols, renewal would occur." Id. at ¶ 52. The emails did not "assert that the Customer's existing Subscription for the preceding year permitted Trustpilot to automatically renew for another year." Id.

TDL alleges that Trustpilot sent autorenewal reminders from a trustpilot.net domain to "prevent[] its customers from actually receiving notice of their impending renewal dates." Id. at ¶ 4. Because all other communications from Trustpilot were sent from the trustpilot.com domain, the renewal email "would go straight to customers' junk folders, preventing them from being seen until subscribers were already auto-enrolled for the new year." Id. at ¶ 4, 50-51. TDL alleges that Trustpilot knew that "using an irregular sender domain . . . guarantees such messages will go to junk." Id. at ¶ 60. Trustpilot also did not use well-known email authentication protocols to prevent the renewal email from going to recipients' spam folders. See id. at ¶ 62. For instance, Trustpilot did not authenticate its trustpilot.net domain under Domain-Based Message Authentication, Reporting, and Conformance ("DMARC"). Id. at ¶ 63. Trustpilot's "deviations from DMARC protocol mean that the [trustpilot.net] domain has not been recognized as an authentic sending domain by recipients . . . and

4

that emails sent from it, namely the Auto-Enroll Emails, have been routed to junk." Id. at ¶ 72.

The Amended Complaint further claims that cancelling a subscription once it had been renewed was "difficult if not impossible." Id. at ¶ 55. Trustpilot "threatened legal action" if Quasar did not pay for the automatically renewed subscription, and "if Plaintiff [Quasar] sought to cancel against Trustpilot's cooperation, this risked Trustpilot's reducing the online visibility of positive reviews of Plaintiff." Id.

TDL posits that Trustpilot concocted this scheme in response to increasing financial pressure and consumer backlash. Trustpilot's parent company is a Danish corporate entity that received start-up capital from Denmark's national investment fund. Id. at ¶ 23, 27. That source of funds "dried up" in 2018, and Trustpilot needed to show private investors that, despite Trustpilot's losses and "struggle[s] to attract U.S. subscribers," the company was on "the road to profitability." Id. at ¶ 30.

The road to profitability, however, was littered with obstacles. In 2018 and 2019, British investigative journalists reported that there was a secret, "preferred class of high-paying [Trustpilot subscribers]" who "were able to have negative reviews blocked or suppressed" in exchange for paying "untold" sums for "bespoke Subscriptions." Id. at ¶ 34, 36.  The BBC reported that when certain business subscribers flagged their negative reviews

of their businesses for removal, Trustpilot complied, effectively enabling the subscribers to censor consumer dissatisfaction. Id. at ¶ 37. The Times of London also reported that, despite Trustpilot's claims to affirmatively search for and remove fake reviews, Trustpilot did not remove clearly fake, positive reviews of high-paying subscriber businesses. Id. at ¶ 40-41.

In September 2019, as part of a campaign to deemphasize "self-serving reviews," Google changed how it embedded Trustpilot content in its search results so that businesses' Trustpilot ratings would no longer appear in all search queries. Id. at ¶ 44-46. This meant that "Trustpilot customers who never had tried to game the review system lost the primary benefit of their Subscriptions." Id. at ¶ 47. TDL claims that as investors and ordinary subscriber businesses grew skeptical of Trustpilot's value, Trustpilot was driven to "trap . . . unsuspecting customers into another year['s subscription] without their knowledge." Id. at ¶ 48.

II. Procedural Background

In January 2021, TDL brought a putative class action lawsuit pursuant to the Class Action Fairness Act of 2005 ("CAFA") against Trustpilot and its Danish parent company Trustpilot A/S. See Compl., ECF No. 1. The Complaint alleged breach of contract, breach of the implied covenant of good faith and fair dealing, unjust

enrichment, violation of New York General Business Law § 349, and violation of unfair business practices statutes in 17 other states. See id. at ¶ 80-101. TDL sought class certification, compensatory damages, pre- and post-judgment interest, attorney's fees, and costs. Id. at 33, ¶ 72. On March 12, Trustpilot moved to dismiss the Complaint. See ECF No. 18. Two weeks later, TDL voluntarily dismissed Trustpilot's parent company from the case. See ECF No. 21. On April 8, 2021, TDL amended the Complaint to add Quasar as a co-plaintiff. See ECF No. 24. Trustpilot again moved to dismiss. See ECF No. 25.

## LEGAL STANDARD

On a motion to dismiss for failure to state a claim, the Court "accepts all of the complaint's factual allegations as true and draws all reasonable inferences in the plaintiffs' favor." Giunta v. Dingman, 893 F.3d 73, 78-79 (2d Cir. 2018). The Court need not accept as true conclusory allegations and "[t]hreadbare recitals of the elements of a cause of action." Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009). Setting aside such allegations, a "complaint must contain sufficient factual matter, accepted as true, to 'state a claim for relief that is plausible on its face.'" Physicians Healthsource, Inc. v. Boehringer Ingelheim Pharm., Inc., 847 F.3d 92, 94 (2d Cir. 2017) (quoting Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 570 (2007)).

For purposes of Rule 12(b), "the complaint is deemed to include any written instrument attached to it as an exhibit or any statements or documents incorporated in it by reference." Cortec Indus., Inc. v. Sum Holding L.P., 949 F.2d 42, 47 (2d Cir. 1991)). A document extraneous to the complaint is "integral" to the complaint and may be considered at the motion-to-dismiss stage if the plaintiff relied upon the document's terms and effect when drafting the complaint. Chambers v. Time Warner, Inc., 282 F.3d 147, 152-53 (2d Cir. 2002). "When a plaintiff chooses not to attach to the complaint or incorporate by reference a document upon which it solely relies and which is integral to the complaint, the court may nevertheless take the document into consideration in deciding the defendant's motion to dismiss, without converting the proceeding to one for summary judgment." Holowecki v. Fed. Exp. Corp., 440 F.3d 558, 565-66 (2d Cir. 2006) (internal quotation marks and alterations omitted). If a document integral to the complaint contradicts that complaint, the document controls, and the court need not accept the complaint's allegations as true. See Feick v. Fleener, 653 F.2d 69, 76 (2d Cir. 1981); TufAmerica, Inc. v. Diamond, 968 F.Supp.2d 588, 592 (S.D.N.Y. 2013); Barnum v. Millbrook Care Ltd. Partnership, 850 F. Supp. 1227, 1232-33 (S.D.N.Y. 1994).

ANALYSIS

I. <u>The Subscriber Agreements are integral to the Amended Complaint.</u>

Plaintiffs' first claims are for breach of contract and for breach of the covenant of good faith and fair dealing implied by law in every contract. Plaintiffs' arguments with respect to these, and indeed all their claims, turn on whether the Plaintiffs were charged in a manner they did not agree to, for services that they did not agree to, at a price they did not agree to. <u>See</u> Am. Compl. at ¶ 84 (class allegations), 87 (implied covenant of good faith and fair dealing claim), 90 (contract claim), 93 (New York consumer protection claim), 100 (multistate consumer protection claims). It is little surprise then that the Amended Complaint repeatedly refers to the terms of the subscription agreements entered into by plaintiffs and others similarly situated. <u>See</u> <u>id.</u> ¶ 84-86, 89-90.

The subscription agreements, and especially the provisions of those agreements alleged to have been breached, are therefore integral to the Amended Complaint and may be considered by the Court on a motion to dismiss. <u>Chambers</u>, 282 F.3d at 152-53. Although this is a matter of procedure as to which federal law governs, it appears to also be the law of New York that governs substantive issues. <u>See, e.g.</u>, <u>Reznick v. Bluegreen Resorts Mgmt., Inc.</u>, 62 N.Y.S.3d 460, 462-63 (2d Dep't 2017) (dismissing a breach of contract claim when "[t]he complaint fails to allege the

provisions of any contract between the [parties] that the defendant breached").

In support of its motion to dismiss, Trustpilot provided the Court with plaintiff Quasar's subscription order forms and the Service Subscription Agreements (the "Agreements") effective on each of Assignor and Quasar's subscription dates. See Silverstein Decl., ECF No. 27, Exs. 2-10. Plaintiffs ask us to ignore these contracts, arguing that the agreements are "unauthenticated" and beyond the pleadings. But plaintiffs do not assert that the Service Subscription Agreements produced by Trustpilot are not the contracts plaintiffs signed. In fact, at oral argument, plaintiffs' counsel claimed he had been unable to find and had never seen a copy of the subscriber agreements upon which he had based the Complaint.[1] See Oral Arg. Tr., ECF No. 31, at 5:2-16.

More generally, plaintiffs provided no reason to believe that the contracts provided by defendant were not the contracts into which plaintiffs entered. See Tr. 5:17-24 (conceding that "the debate in this particular section is not whether or not the contract is the contract"). Because the Amended Complaint relies upon the terms and effect of the Service Subscription Agreements, and there is no reason to doubt the accuracy, authenticity, or

---

[1] Whether this calls for Rule 11 sanctions, the Court need not decide at this time.

direct relevancy of the agreements provided by Trustpilot, the Court will consider the agreements in evaluating the motion to dismiss.

II. <u>The Court denies the motion to dismiss plaintiff Trustpilot Damages LLC for lack of standing.</u>

Under New York's anti-champerty statute, no corporation may "directly or indirectly, itself or by or through its officers" take assignment of "any claim or demand, with the intent and for the purpose of bringing an action or proceeding thereon." N.Y. Jud. L. § 489. An assignment is champertous when the "intent to sue on that claim" was the "primary purpose for, if not the sole motivation behind, entering into the transaction." <u>Justinian Capital SPC v. WestLB AG</u>, 65 N.E.3d 1253, 1256 (N.Y. 2016) (quoting <u>Bluebird Partners, L.P. v. First Fid. Bank, N.A.</u>, 731 N.E.2d 581, 587 (N.Y. 2000)). In contrast, when the assignment of a right to sue is incidental to a larger business transaction, the assignment is not champertous. <u>See, e.g.</u>, <u>Fairchild Hiller Corp. v. McDonnell Douglas Corp.</u>, 270 N.E.2d 691, 693 (N.Y. 1971). A champertous assignment is void, "effectively den[ying] the Plaintiff standing to assert a claim." <u>Gowen v. Helly Nahmad Gallery, Inc.</u>, 77 N.Y.S.3d 605, 631 (N.Y. Sup. Ct. 2018), <u>aff'd</u>, 95 N.Y.S.3d 62 (1st Dep't 2019). A corporation who is assigned a right for the primary purpose of litigation is barred from recovery in this judicial district, regardless of the entity's place of incorporation. <u>See</u>,

11

e.g., <u>Am. Optical Co. v. Curtiss</u>, 56 F.R.D. 26, 30-31 (S.D.N.Y. 1971) (enforcing the anti-champerty statute against a Massachusetts corporation, because the assignment "is contrary to the public policy of New York" and a federal court sitting in diversity could not permit such a suit to go forward); <u>Refac Int'l, Ltd. V. Lotus Dev. Corp</u>, 131 F.R.D. 56, 58 (S.D.N.Y. 1990) (enforcing the statute against a Canadian corporation).

Courts have suggested that an assignment is not void for champerty when a plaintiff corporation "had such a relationship with its assignors as to give it a substantial and legitimate interest in the transactions involved in the suit." <u>See</u> <u>Am. Exp. Co. v. Control Data Corp.</u>, 376 N.Y.S.2d 153, 154 (1st Dep't 1975) (per curiam); <u>see also</u> <u>Tr. For the Certificate Holders of Merrill Lynch Mortg. Inv'rs, Inc. v. Love Funding Corp.</u>, 918 N.E.2d 889, 895 (N.Y. 2009) (finding the champerty doctrine inapplicable when a plaintiff who took assignment of a lender's rights under a loan purchase agreement "had a preexisting proprietary interest in the loan"). This is not quite the case here. Though TDL brings a claim that one of its principals could have brought individually, there is no allegation that TDL had a pre-assignment interest in the Trustpilot subscriptions at issue. Likewise, there is no allegation that TDL contracted with Trustpilot or subscribed to its services, or that Assignor purchased a business subscription on TDL's behalf. Moreover, in cases finding an assignment non-

champertous because of the relationship between plaintiff and assignor, the corporation acquired a right that it later sued to enforce, rather than purchasing a cause of action untethered from any other right. See Love Funding Corp., 918 N.E.2d at 891 (distinguishing between "one who acquires a right in order to make money from litigating it and one who acquires a right in order to enforce it").

Moreover, plaintiffs offer no explanation for why TDL acquired Assignor's cause of action -- or indeed, why TDL exists -- other than "to obtain justice for Trustpilot subscribers affected by the violations described" in the Amended Complaint. Am. Compl. at ¶ 17; see Erlich v. Ebco Ins. Exch., Ltd., 649 N.Y.S.2d 672, 674 (1st Dep't 1996) (dismissing claims as champertous at summary judgment when plaintiff conceded that assignment of claims was made to assert those claims in litigation, and "[n]o other purpose for the assignment is even suggested").

However, notwithstanding all this, whether an assignment is champertous depends on the intent behind the assignment, a factual inquiry not easily resolved at the motion to dismiss stage. See Tr. for the Certificate Holders of Merrill Lynch Mortg. Inv'rs, Inc. v. Love Funding Corp., 918 N.E.2d 889, 894 & n.6 (N.Y. 2009) (observing that "[t]he inquiry into purpose is a factual one" and the issue could be "amenable to summary judgment in an appropriate case"); Fairchild Hiller Corp. v. McDonnell Douglas Corp., 270

N.E.2d 691, 693 (N.Y. 1971) ("[T]he question of intent and purpose of the purchaser or assignee of a claim is usually a factual one to be decided by the trier of facts."). Accordingly, the Court denies the motion to dismiss TDL from the suit for lack of standing, but without prejudice to this issue being revisited on an appropriate factual record.

III. <u>Plaintiffs do not state a claim under New York General Business Law § 349.</u>

The Court now turns to the merits of the motion to dismiss. While the Amended Complaint may describe some sharp practices on the part of defendant, whether the blunt instrument of the law prohibits these practices is another question. Plaintiffs first allege that Trustpilot violated New York General Business Law § 349 by automatically renewing customer subscriptions in violation of New York General Obligations Law § 5-903. <u>See</u> Am. Compl. ¶ 91-93, 96. Plaintiffs fail to state a claim under these provisions for three separate reasons. First, plaintiffs have not plausibly alleged that Trustpilot engaged in "consumer-oriented" conduct by including an autorenewal provision in contracts with business subscribers. Second, Trustpilot's conduct was not deceptive. Third, plaintiffs do not plausibly allege that the subscriber agreements were contracts relating to personal property.

14

A. <u>Trustpilot's conduct was not consumer oriented.</u>

Under section 349, a plaintiff must establish: "first, that the challenged act or practice was consumer-oriented; second, that it was misleading in a material way; and third, that the plaintiff suffered injury as a result of the deceptive act." <u>Stutman v. Chem. Bank</u>, 731 N.E.2d 608, 611 (N.Y. 2000). Consumers are those who "purchase goods and services for personal, family, or household use." <u>Sheth v. N.Y. Life Ins. Co.</u>, 709 N.Y.S.2d 74, 75 (1st Dep't 2000). Thus, "[b]usiness-to-business transactions and private contract disputes unique to the parties do not typically give rise to section 349 claims." <u>In re LIBOR-Based Fin. Instruments Antitrust Litig.</u>, 2015 WL 6243526, at *92 (S.D.N.Y. Oct. 20, 2015). A dispute between businesses implicates section 349 only when the business is injured by "acts or practices that have a broader impact on consumers at large." <u>Oswego Laborers' Loc. 214 Pension Fund v. Marine Midland Bank, N.A.</u>, 647 N.E.2d 741, 744 (N.Y. 1995); <u>see also</u> <u>Tropical Sails Corp. v. Yext, Inc.</u>, 2015 WL 2359098, at *4 (S.D.N.Y. May 18, 2015).

Plaintiffs have not adequately pled that the challenged practices were "consumer-oriented." First, TDL, Quasar, and the subscriber businesses they putatively represent are not consumers themselves, because they did not purchase Trustpilot subscriptions for personal, family, or household use.

Second, Plaintiffs do not plead that the disputed behaviors affect consumers at large. Much of the Amended Complaint focuses on review suppression and manipulation that could plausibly distort consumer perceptions and thereby harm consumers. However, these allegations are offered to explain the motive for Trustpilot's alleged autorenewal scheme, and none of the causes of action arises from the harm the alleged review manipulation caused consumers. Plaintiffs claim that Trustpilot's autorenewal practices were "consumer-oriented in that . . . Trustpilot reviews concerning the Class members continued to appear online directed at consumers . . . to a greater extent than they would have been." Am. Compl. ¶ 95. But Plaintiffs do not sue over the continued visibility of reviews of their businesses; Plaintiffs complain that they were charged for unwanted subscriptions. It is not enough that some aspects of Trustpilot's business are consumer oriented. "[T]he challenged act" must be consumer-oriented to sustain a section 349 claim. See <u>Stutman</u>, 731 N.E.2d at 611.

B. <u>Trustpilot's conduct was not deceptive.</u>

Even if Trustpilot's conduct were consumer-oriented, Plaintiffs fail to allege a deceptive trade practice under New

16

York law.[2] An autorenewal provision that is "specifically provided for by the parties' [agreement] and thus was fully disclosed . . . is not a deceptive business practice within the meaning of General Business Law § 349(a)." Ludl Elecs. Products, Ltd. v. Wells Fargo Fin. Leasing, Inc., 775 N.Y.S.2d 59, 61 (2d Dep't 2004).

C. General Obligations Law § 5-903 does not apply.

Plaintiffs argue that Trustpilot has violated section 349 by engaging in a business practice prohibited by New York General Obligations law § 5-903. Under New York General Obligations Law § 5-903, an autorenewal provision in "a contract for service, maintenance, or repair to or for any real or personal property" is unenforceable unless the service provider reminds the recipient of

---

[2] The Subscription Service Agreements each contain a New York choice-of-law clause, see, e.g., Silverstein Decl., Ex. 2, at § 16.1, which must be enforced "so long as the chosen law bears a reasonable relationship to the parties or the transaction." Welsbach Elec. Corp. v. MasTec N. Am., Inc., 859 N.E.2d 498, 500 (N.Y. 2006). Plaintiff Trustpilot Damages LLC maintains an office in New York, Assignor is headquartered in New York, and Trustpilot maintains its principal place of business in New York. Am. Compl. ¶ 17-18, 22. New York law therefore bears a reasonable relationship to the parties, and it would not be unfair to enforce the choice-of-law clause. A further conflict-of-laws analysis is thus unnecessary. Ministers and Missionaries Ben. Bd. v. Snow, 45 N.E.3d 917 (N.Y. 2015) ("[W]hen the parties have chosen New York law to govern their dispute . . . New York courts should not engage in any conflicts analysis."). Since New York law governs, it follows that the deceptive trade practice claims brought under other states' laws must be dismissed.

the autorenewal provision in writing at least 15 but no more than 30 days before the cancellation deadline. N.Y. Gen. Oblig. Law § 5-903(2).

Courts must "generously" read the phrase "service, maintenance or repair to or for any real or personal property" to address "the variegated evil the statute was intended to meet." Tel. Secretarial Serv. v. Sherman, 284 N.Y.S.2d 384, 385-86 (2d Dep't 1967) (holding that the autorenewal statute applied to a telephone answering service, because the defendant provided the service of recording and relaying messages to or for a telephone in a doctor's office). Accordingly, courts have interpreted "personal property" to encompass both tangible and intellectual property. Healthcare I.Q., LLC v. Tsai Chung Chao, 986 N.Y.S.2d 42, 45-46 (1st Dep't 2014).

However, the autorenewal law is not boundless. It does not apply to "personal services contracts," such as consulting or administrative services contracts. Donald Rubin, Inc. v. Schwartz, 559 N.Y.S.2d 307, 310 (1st Dep't 1990) (finding statute inapplicable to contract to provide budgeting and staffing advice); Prial v. Supreme Court Uniformed Officers Ass'n, 397 N.Y.S.2d 528, 530 (1st Dep't 1977) (declining to apply statute to attorney retainer agreement); see also Carbo Indus., Inc. v. Refining & Mktg., 154 F. App'x 218, 219-20 (2d Cir. 2005) (acknowledging exception for personal services contracts). New

York state courts have been unwilling to apply the statute to so-called "property" that does not "hav[e] an existence separate and apart" from the services provided under the contract. See Healthcare I.Q., LLC, 986 N.Y.S.2d at 46; see also, e.g., Trepp, LLC v. McCord Dev., Inc., 953 N.Y.S.2d 600, 600 (1st Dep't 2012) (finding statute inapplicable to "contract under which plaintiff agreed to give defendant access to its information and analytics" on mortgage-backed securities); Wornow v. Register.Com, Inc., 778 N.Y.S.2d 25, 26 (1st Dep't 2004) (refusing to apply statute to a contract relating to a domain name that was not patented or trademarked).

New York's autorenewal law does not render the contract provision unenforceable, because the Trustpilot subscription agreements are not "contracts for service to or for any real or personal property," whether tangible or intellectual. The subscription agreements are contracts to provide analytical consumer insight data to businesses and to enable businesses to display Trustpilot reviews on their websites and social media accounts. See Am. Compl. ¶ 3, 36, 42; see also, e.g., Silverstein Decl., Ex. 2, at § 2.1.6 (describing "review insights service"). Plaintiffs do not plead that they own either the consumer insight data or the Trustpilot reviews of their businesses. See Wornow, 778 N.Y.S.2d at 26 (holding that because "a domain name that is not trademarked or patented is not personal property, but rather

a contract right that cannot exist separate and apart from the services performed . . . General Obligations Law § 5-903 . . . is inapplicable").

Plaintiffs overstate the holding of the main case upon which they rely: Healthcare I.Q., LLC v. Tsai Chung Chao, 986 N.Y.S.2d 42, 45-46 (1st Dep't 2014). Contrary to the plaintiffs' claims, the holding in this case does not stand for the broad proposition that electronic data is personal property within the meaning of section 5-903. In Healthcare I.Q., LLC, the Appellate Division applied section 5-903 to an agreement that licensed medical billing software from a healthcare services company to a doctor's office. Id. at 43. The licensing agreement required the doctor's office to turn over voluminous paper records so that the healthcare services company could digitize, process, organize, and maintain the records for billing and reimbursement. Id. The court reasoned that the services "related to the billing and medical records of the practice, which are personal property." Id. at 46.

Here, however, plaintiffs do not allege that subscriber businesses provided Trustpilot with comment cards accumulated over the years so that Trustpilot could generate digital reviews and provide analysis. Nor do Plaintiffs argue that they own copyrights in the reviews' text or have patented a method of computing consumer satisfaction. Instead, the rights to access consumer insight data and to reproduce and display Trustpilot reviews are

"contract right[s] that cannot exist separate and apart from the services performed." Wornow, 778 N.Y.S.2d at 26. Thus, New York General Obligations Law § 5-903 does not apply and cannot be the basis for a violation of New York General Business Law § 349.

IV.  Plaintiffs do not state a claim for breach of contract.

Plaintiffs must plead the existence of a valid contract, performance by the plaintiff, breach by the defendant, and damages to state a claim for breach of contract under New York Law. See, e.g., Eternity Global Master Fund Ltd. v. Morgan Guaranty Trust Co. of New York, 375 F.3d 168, 177 (2d Cir. 2004). The plaintiff must identify the essential terms of the contract, including a specific provision of the contract that was breached, to state a claim. See NFA Grp. V. Lotus Research, Inc., 120 N.Y.S.3d 75, 76 (2d Dep't 2020); Woodhill Elec. v. Jeffrey Beamish, Inc., 904 N.Y.S.2d 232, 233 (1st Dep't 2010); Shields v. Sch. of Law, Hofstra Univ., 431 N.Y.S.2d 60, 62 (2d Dep't 1980) (observing that when a plaintiff does not plead the contractual provisions a defendant breached, "there is no basis to conclude that [the defendant's conduct] involved anything other than the exercise of . . . discretion, unfettered by contract and unreviewable by courts"). Dismissal is warranted when the contract's unambiguous language forecloses the plaintiff's claim. See Photopaint Techs., LLC v.

Smartlens Corp., 335 F.3d 152, 160 (2d Cir. 2003); Spinelli v.
Nat'l Football League, 96 F. Supp. 81, 131 (S.D.N.Y. 2015).

The Amended Complaint offers broad, conclusory, and sometimes
contradictory assertions about what the Agreements either did not
allow or did not address. For instance, plaintiffs allege that the
subscription agreements did not "permit[] Trustpilot to . . . raise
rates," but do not allege that the autorenewal or any other
specific provision promised that Trustpilot would hold rates
steady. See id. Similarly, the Amended Complaint decries at length
Trustpilot's use of an unexpected domain to send "renewal-reminder
emails." See id. at ¶ 14. 87, 90. But plaintiffs do not plead that
any contractual provision required Trustpilot to send renewal
reminder communications from a trustpilot.com domain, or to remind
customers to cancel their subscriptions or face renewal. Indeed,
the only specific contractual provision identified in the Amended
Complaint is an autorenewal provision "whereby customers were
automatically re-enrolled for another year unless the customer
gave notice of an intent to cancel." See Am. Compl. ¶ 4.

Yet, the Amended Complaint somehow asserts that the
"Subscriptions into which Class members entered did not permit
Trustpilot to automatically renew for another year's
Subscription." Id. at ¶ 87, 90. Given the express autorenewal
provision (as described more fully below), this conclusory
assertion is unsupportable. And, in any event, without identifying

a specific provision of the Service Subscription Agreements that Trustpilot breached, plaintiffs cannot succeed on their breach of contract claim.

Indeed, the terms of the contracts themselves do not support any of plaintiffs' breach of contract claims.[3] Regarding autorenewal, the Service Subscription Agreements each provide that "[o]n the last day of the Initial term" and "on each subsequent anniversary of that date, the Agreement will automatically be renewed" at a "non-discounted price for an additional period of same duration as the Initial term." Silverstein Decl., Ex. 2 (November 2016 Agreement), at § 7.2; Ex. 5 (Aug. 2015 Agreement), at § 7.2; Ex. 8 (April 2019 Agreement), at § 7.2; Ex. 10 (January 2020 Agreement). However, if a subscriber business "notifies [Trustpilot] of its intent not to renew" by sending an email to support@trustpilot.com "no less than thirty (30) days prior to the end of the then-current term," the subscription will be cancelled. Id.

---

[3] The Agreements contain trivial differences that are not material to plaintiffs' claims. The Agreements that went into effect after November 2016 do not include a comma after the phrase "Initial Term," introduce the adverbs "then-current, standard" to modify the phrase "non-discounted price," and give Trustpilot the reciprocal right to give notice of intent to cancel a subscription. Compare Silverstein Decl., Ex 5 (Aug. 2015) with id. at Ex. 2, at § 7.2; Ex. 8, at § 7.2; and Ex. 10, at § 1.3.

Plaintiffs claim that Trustpilot breached the agreements by renewing subscriptions, usually at a higher subscription price, without first sending a reminder email from a trustpilot.com domain. See Am. Compl. ¶ 87. However, the contracts explicitly state that Trustpilot will automatically renew subscriptions at a "non-discounted price" unless instructed otherwise. The contracts state that Trustpilot "will inform Customer of any changes in Trustpilot's prices for the subsequent renewal term . . . by written notice no later than forty-five (45) days prior to the expiration of the current term," but the contracts do not specify the email address or domain from which customers must receive such notice. See, e.g., Silverstein Decl., Ex. 2, at § 5.1. There is no breach of contract where a defendant complies with the autorenewal terms of a contract and does not refuse to honor customers' requests to cancel their contracts. See Mazzola v. Roomster Corp., 849 F. Supp. 2d 395, 403 (S.D.N.Y. 2012). Accordingly, plaintiffs fail to state a claim for breach of contract.

V.   Plaintiffs do not state a claim for breach of the implied covenant of good faith and fair dealing.

Contracts governed by New York law contain an implied covenant to refrain from any action "which will have the effect of destroying or injuring the right of the other party to receive the fruits of the contract." Dalton v. Educ. Testing Serv., 663 N.E.2d 289, 291 (N.Y. 1995) (quoting Kirke La Shelle Co. v. Armstrong

Co., 188 N.E. 163, 167 (N.Y. 1933)). The implied covenant cannot be inconsistent with the express terms of a contract, nor can it be used to add contract terms not bargained for. See Murphy v. Am. Home Prods. Corp., 448 N.E. 2d 87, 91 (N.Y. 1983). If "a breach of contract claim, based upon the same facts, is also pled," courts applying New York law "do[] not recognize a separate cause of action for breach of the implied covenant of good faith and fair dealing." Harris v. Provident Life & Accident Ins. Co., 310 F.3d 73, 81 (2d Cir. 2002).

The good faith and fair dealing claim also alleges that Trustpilot failed to take steps to keep the autorenewal reminder email from going to recipients' spam folders and to make the autorenewal terms and cancellation procedure more obvious to subscribers. See id. at ¶ 87(e)-(j). But because the contract clearly sets forth an autorenewal procedure, the proper way to avoid autorenewal, and the notices of price changes that the subscribers can expect to receive before renewal, the court cannot add or imply different contractual rights on the same subject. See Hartford Fire Ins. Co. v. Federated Dept. Stores, Inc., 723 F. Supp. 976, 991 (S.D.N.Y. 1989).

The remaining allegations in support of plaintiffs' good faith and fair dealing claim are duplicative of the breach of contract claim. In support of both causes of action, plaintiffs allege that Trustpilot "endeavored to impose another year's

Subscription" on class members at higher rates although "the prior Subscription . . . did not permit Trustpilot to automatically renew]," and "administer[ed] the Subscriptions such that a minority of high-paying, preferred customers received extraordinary benefits," which "would, if uncovered, diminish the overall value of Subscriptions generally." Compare Am. Compl. at ¶ 87(a)-(d) with id. at ¶ 90(a)-(c). Because plaintiffs' claims for breach of contract and breach of the implied covenant of good faith and fair dealing arise from the same facts and seek the same damages, the latter claim is duplicative and must be dismissed. See Amcan Holdings, Inc. v. Canadian Imperial Bank of Com., 894 N.Y.S.2d 47, 49 (1st Dep't 2010); see also Mill Fin., LLC v. Gillett, 992 N.Y.S.2d 20, 25 (1st Dep't 2014) ("Where a good faith claim arises from the same facts and seeks the same damages as a breach of contract claim, it should be dismissed.").

VI.   Plaintiffs do not state a claim for unjust enrichment.

A plaintiff may plead breach of contract and unjust enrichment in the alternative when the plaintiff "dispute[s] the existence and enforceability of [the] contract" at issue. First Class Concrete Corp., 91 N.Y.S.3d at 443. However, a plaintiff cannot maintain an unjust enrichment claim when there is a "valid and enforceable contract between the parties covering the dispute at issue." AHA Sales, Inc. v. Creative Bath Prods., Inc., 867 N.Y.S.2d

169, 180 (2d Dep't 2008); see also Clark-Fitzpatrick, Inc. v. Long
Island R.R. Co., 516 N.E.2d 190, 193 (N.Y. 1987) (explaining that
a "quasi contract" is a legal fiction created "to prevent a party's
unjust enrichment," and thus "[t]he existence of a valid and
enforceable written contract governing a particular subject matter
ordinarily precludes recovery in quasi contract for events rising
out of the same subject matter").

The existence of a valid and enforceable Service Subscription
Agreements precludes plaintiffs' unjust enrichment claim.[4]

---

[4] Plaintiffs advance a meritless argument that the autorenewal
provisions of the subscriber agreements are unenforceable. But
plaintiffs do not state a claim for unjust enrichment, even if
pleaded in the alternative. To state a claim for unjust enrichment,
a plaintiff must plausibly allege that the defendant was enriched
at the plaintiff's expense and that it is "against equity and good
conscience to permit [the defendant] to retain what is sought to
be recovered." Cruz v. McAneney, 816 N.Y.S.2d 486, 490-91 (2d Dep't
2006). It is not contrary to equity and good conscience to allow
Trustpilot to keep the benefit of its bargain. Plaintiffs claim
that "Trustpilot derived substantial, unjustified and exorbitant
sums for itself . . . after unlawfully imposing another year's
Subscription." Am. Compl. ¶ 104. But as discussed above, the
Service Subscription Agreements disclosed that Trustpilot would
renew subscriptions annually unless Trustpilot received a
cancellation notice. Plaintiffs assert that "if Plaintiff sought
to cancel against Trustpilot's cooperation, this risked
Trustpilot's reducing the online visibility of positive reviews of
Plaintiff." Id. But only Trustpilot's subscriber businesses can
"control[] how consumer reviews about them are displayed online."
Id. at ¶ 4, 36. Reduced online visibility is a natural consequence
of no longer being a subscriber business. This allegation amounts
to a complaint that if a subscriber stopped making the agreed-upon
payments, Trustpilot would stop providing the agreed-upon
benefits. There is no injustice in that.

Plaintiffs premise their unjust enrichment claim on allegations that Trustpilot "unlawfully impos[ed] another year's Subscription" on its subscribers. See Am. Compl. ¶ 104. The conditions under which Trustpilot can renew its customers' subscriptions are clearly set forth in the Service Subscription Agreements under the heading "Automatic renewal." See Silverstein Decl., Ex. 2 at § 7.2; Ex. 5 at § 7.2; Ex. 8 at § 7.2; Ex. 10 at § 1.2 (explaining the renewal and termination procedures). The contract permitted Trustpilot to "impose" annual subscriptions on its customers until Trustpilot received notice of the customer's intent to cancel. Id. Because contractual provisions cover the same territory as Plaintiffs' unjust enrichment claim, the claim must be dismissed. In short, plaintiffs may have entered into agreements that they now view as unfair, but they got what they agreed to, and so cannot plausibly claim that the defendant was unjustly enriched.

## CONCLUSION

For the foregoing reasons, the Court hereby dismisses the Amended Complaint in its entirety and with prejudice. Clerk to enter judgment.


SO ORDERED.

Dated:    New York, NY

          June 29, 2021                      JED S. RAKOFF, U.S.D.J.


28